STATE of Wisconsin, Plaintiff-Respondent,

v.

Randy L. MARTIN, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2010AP505–CR. Oral argument April 18, 2012.*
*—Decided July 13, 2012.*

2012 WI 96

(Also reported in 816 N.W.2d 270.)

For the defendant-appellant-petitioner, there were briefs filed by *Byron C. Lichstein* and *Frank J. Remington Center,* Madison, and oral argument by *Byron C. Lichstein.*

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

¶ 1. MICHAEL J. GABLEMAN, J. We review an unpublished decision of the court of appeals[1] affirming the Milwaukee County Circuit Court's judgment of conviction against Randy L. Martin ("Martin").[2] The State charged him with one count of possession of a firearm by a felon in violation of Wisconsin Statutes section 941.29(2),[3] and one count of carrying a con-

---

[1] *State v. Martin,* No. 2010AP505–CR, unpublished slip op. (Wis. Ct. App. May 3, 2011).

[2] The Honorable Kevin E. Martens presiding.

[3] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated. Wisconsin Statutes section 941.29(2) provides, in relevant part:

> A person specified in sub. (1) is guilty of a Class G felony if he or she possesses a firearm under any of the following circumstances:
>
> (a) The person possesses a firearm subsequent to the conviction for the felony or other crime, as specified in sub. (1) (a) or (b).

284

cealed weapon in violation of § 941.23.[4] At trial, a jury found Martin guilty on both counts.

¶ 2. Two issues are presented for our consideration: 1) whether *Miranda v. Arizona,* 384 U.S. 436 (1966) required the suppression of Martin's statements taken at the scene, and 2) if it did require suppression, whether the erroneous admission of these statements was harmless.

¶ 3. Because Martin made incriminating statements while in police custody and while being subjected to interrogation by police officers, we conclude that he had a Fifth Amendment right to receive *Miranda* warnings. Accordingly, we hold that it was error to admit the incriminating statements at trial. Further, we hold that because the State has not met its burden of proving that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error," *State v. Harvey,* 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189 (quoting *Neder v. United States,* 527 U.S. 1, 18 (1999)), the error was not harmless. Accordingly, we reverse the decision of the court of appeals and remand the cause for a new trial.

## I. FACTS

¶ 4. On November 14, 2008, Milwaukee Police Sergeant James Fidler ("Fidler")[5] was traveling eastbound on West North Avenue in the City of Milwaukee,

---

[4] Wisconsin Stat. § 941.23 provides:

Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor. Notwithstanding s. 939.22 (22), for purposes of this section, peace officer does not include a commission warden who is not a state-certified commission warden.

[5] At trial, the State called Fidler, Milwaukee Police Officers Hollis Smith and Andrew Moutry, Milwaukee Police Depart-

approaching a red light at the intersection of West North Avenue and North 49th Street. While Fidler was in the process of stopping, he observed a 2004 Hyundai Santa Fe sport utility vehicle (the "SUV") with tinted rear windows directly in front of his squad car, as well as another vehicle (the "car") in front of the SUV. Fidler observed Martin exit the SUV from the driver's side door, walk forward toward the car, and shout at the driver of the car. From his vantage point, Fidler could also see the driver of the car, who was shouting back at Martin through an open window of the car. As Martin moved toward the car, the other driver alighted from his vehicle, presumably to confront Martin.

¶ 5. As soon as the driver of the car exited his vehicle, he noticed Fidler, and chose to remain at the door of the car. Martin, however, who apparently did not see Fidler, continued to proceed toward the car. As Martin approached the car, Fidler observed Martin retrieve an object from his jacket pocket and point it at the driver of the car, and heard Martin say to the driver of the car "I have something, I've got something for you." Fidler could not see the object Martin had retrieved from his jacket; however, when Martin produced that item from his pocket, the driver of the car motioned toward Fidler. As Fidler approached both drivers, Martin placed the item back in his pocket, and

ment Identification Technician Robbie Lloyd, and State Crime Lab Forensic Scientist Chiara Weunsch. Martin called Marie Krentz, the co-owner of the vehicle Martin was driving and Martin's girlfriend, and Lee Roy Henry, the passenger in the vehicle. Martin did not testify.

Fidler, Smith, Moutry, and Henry testified at a pre-trial suppression hearing, and their testimony from that hearing is consistent with that which they provided at trial.

began to return to the SUV. Fidler immediately called Martin toward him, and placed him in handcuffs.

¶ 6. After placing Martin in handcuffs,[6] Fidler searched Martin and found an expandable baton in his pocket. That baton was approximately six inches in length when collapsed, but was capable of expanding to a length of over 15 inches.

¶ 7. As Fidler was completing his search of Martin, Officers Hollis Smith ("Smith") and Andrew Moutry ("Moutry") approached the scene, heading westbound on West North Avenue in a second marked squad car. They noticed Fidler engaged with Martin, and stopped to assist Fidler.[7] When Smith and Moutry approached Fidler to see if he needed assistance, he instructed them to search Martin's SUV.

¶ 8. At that point, Smith discovered Lee Roy Henry ("Henry"), a close childhood friend of Martin's,[8] seated in the passenger seat of the SUV. After Henry exited the vehicle,[9] Smith searched the SUV. While

---

[6] Fidler testified at trial that he initially arrested Martin for disorderly conduct.

[7] There is no evidence in the record that Fidler ever contacted Smith and Moutry to assist him with Martin. However, it is not unusual that these two officers were in the area given that the events incident to this case took place roughly 150 yards from the Milwaukee Police Department District No. 3's building, located on North 49th Street.

[8] The record indicates that Henry had maintained a close relationship with Martin for many years; in fact, their relationship was so close that Martin referred to Henry as his "uncle," even though they are of no relation.

[9] One of the contested points at trial was the amount of time that Henry was in the vehicle before he was asked by Smith to exit the vehicle. Fidler alluded to the fact that as little as one or two minutes elapsed between the time the incident

conducting that search, Smith discovered a loaded "High Standard" .22 caliber revolver (the "revolver") concealed in a small pull-out tray under the passenger seat. Smith, who was not wearing gloves at the time of the search, removed the entire tray from the SUV with the revolver still inside, but did not touch the revolver. Smith described the revolver as unusual for two reasons: it was larger than most .22 calibers with which he was familiar, and it was capable of holding nine cartridges in its cylinder.[10]

¶ 9. The witnesses' versions of events begins to differ at the point where they recount Smith removing the tray from the SUV. The police officers' version of the events is as follows.[11]

¶ 10. Smith testified that he carried the tray containing the revolver over to Martin and Henry and showed them the revolver. He then asked Martin and Henry, neither of whom had been provided with *Miranda* warnings,[12] who the owner of the revolver was. Both Martin and Henry denied ownership of the

started and when Smith and Moutry arrived on scene. Smith stated that he searched the SUV "a few minutes" after arriving on the scene, but Moutry stated that Smith began the search of the SUV "[w]ithin 20 minutes" of arriving on the scene. Henry stated that "[a]bout maybe five minutes" elapsed between Fidler's initial interaction with Martin and Smith's request that Henry exit the SUV.

[10] Moutry provided testimony that authenticated the revolver shown to the jury at trial.

[11] Fidler provided limited testimony on these events, none of which controverts Smith's testimony. Because Smith was directly engaged with Henry, our recitation of the facts roughly tracks his testimony.

[12] The parties agree that Martin and Henry were not provided with warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966).

revolver. Smith testified at trial that he then "told Mr. Henry, who was the passenger, and [was] sitting basically on top of this weapon, that I was placing him under arrest for carrying [a] concealed weapon."

¶ 11. Smith testified that as he prepared to place Henry under arrest, Martin asked Smith and Fidler why Henry was being arrested. Smith replied that he was placing Henry under arrest for carrying a concealed weapon. Martin then asked the police officers whether they would let Henry go if he (Martin) admitted the revolver belonged to him. In response to this question, Smith told Martin that he did not want Martin to say it was his revolver if it was not, but he should be a "stand-up guy" and admit the revolver was his if it was. Martin responded by telling Smith that the revolver belonged to him, and that he should let Henry go.

¶ 12. Even though Martin stated that the revolver belonged to him, Smith asked Martin to describe it. Martin responded that it was a black .22 caliber handgun, which Smith testified at trial would have been difficult to determine through just a visual examination. Based on Martin's admission that the revolver belonged to him, the police arrested Martin, and chose not to arrest Henry.

¶ 13. Henry's version of the events was slightly different.[13] He testified that Smith did not show the tray to him, and he was unsure if Smith showed the tray to Martin. Smith then asked both Martin and Henry who owned the revolver, and both denied ownership. Henry stated that the officer thought the revolver belonged to him because it was under the pas-

_____

[13] Martin did not testify at the trial; therefore, the only defense witness at trial who was present at the scene of the alleged crime was Henry.

senger seat, where Henry was seated. Henry testified that Smith then asked Martin whether he was "gonna [sic] be a stand-up guy and let your uncle go to jail for this gun being in the vehicle, or are you gonna [sic] man up." Martin then asked Smith what type of gun it was, and, according to Henry, Smith responded that Martin "should know what type of gun it was" if it belonged to him. As to the events that took place after this point, Henry admitted that his memory was not clear as to the chronology, but was certain that Martin made two statements. First, he testified that Martin described the revolver to an officer, but that in his description Martin did not mention its caliber or color. Second, Henry testified that Martin told an officer that if he let his uncle (Henry) go, he (Martin) would say the revolver was his.

## II. PROCEDURAL HISTORY

¶ 14. The State charged Martin with one count of possession of a firearm by a felon in violation of Wis. Stat. § 941.29(2), and one count of carrying a concealed weapon in violation of § 941.23.[14] At the preliminary hearing, Martin pleaded not guilty to both charges, and the case was set for trial soon thereafter.

¶ 15. Before trial, Martin brought a suppression motion that sought to preclude the introduction at trial of his statements to the police.[15] At the hearing on this

---

[14] This charge relates to the baton found by Fidler on Martin's person. The parties have advanced no arguments relating to this charge.

[15] Martin's motion also argued that the search of the vehicle was improper, and that the discovery of the revolver should have been similarly suppressed. Martin made this argument to the court of appeals as well, but did not include it in his briefs to this court. Therefore, we decline to address the issue.

290

motion, the court heard testimony from Fidler, Smith, and Henry regarding the events incident to the case. Martin's counsel argued that one of the officers should have Mirandized Martin before engaging in custodial questioning, and therefore any statement of Martin's that followed the improper questioning was properly suppressed.

¶ 16. The circuit court, after hearing the testimony and argument, decided that because 1) Martin's response to the first question was exculpatory,[16] rather than inculpatory,[17] and 2) Martin's question regarding why the officers were taking Henry into custody was not in response to a question, there was "no violation of *Miranda*." Accordingly, the circuit court denied Martin's motion to suppress the statements.

¶ 17. Martin's two-day jury trial began on April 6, 2009.[18] The State and Martin presented their theories of the case to the jury in both opening statements and closing arguments. During its opening statement, the State made the following comments regarding the felon in possession charge:

> [O]fficers who came to assist Sergeant Fidler[] searched the vehicle of [Martin], a vehicle which he purchased — excuse me — a vehicle which he co-owned

---

[16] Exculpatory answers are those that do not implicate an individual in a crime. *Black's Law Dictionary* 836 (9th ed. 2009) (stating that "exculpate" means "[t]o free from blame or accusation").

[17] Inculpatory answers are those that implicate an individual in a crime. *Black's* 648 (stating that "inculpate" means "[t]o implicate (oneself or another) in a crime or other wrongdoing").

[18] Prior to trial, the parties stipulated that Martin was a convicted felon. Therefore, the State was required to prove only that Martin had knowing control over the revolver.

> with another individual. In that vehicle, you will hear, a .22 caliber revolver was found under the seat of the vehicle. You will hear questions were asked about that weapon. As a matter of fact, the defendant admitted that it was his gun. He even described the weapon when asked the type of weapon it was.

(emphasis added).

¶ 18. Martin presented a three-fold theory in his opening statement: first, that because he had purchased the SUV only a few months prior to the incident, he did not know that the revolver was in the tray under the seat; second, that he did not adequately describe the revolver, but instead confessed to possessing the revolver to protect Henry; and third, that Henry was in the vehicle for a considerable amount of time before the police asked him to exit the vehicle, arguing by inference that Henry placed the revolver in the tray under the seat.

¶ 19. In addition to the testimony provided by those present at the scene, Milwaukee Police Department Identification Technician Robbie Lloyd ("Lloyd") testified at trial that he tested the revolver and cartridges in the revolver for fingerprints, but was unable to recover anything of evidentiary value. He also testified that it is rare to recover fingerprints from a firearm or cartridges, but that the revolver was a better than average candidate to produce fingerprints because it is large and contains a significant number of flat surfaces. Lloyd explained that the reason it is difficult to recover fingerprints from a firearm is that they can be easily wiped away by contact with the firearm. Finally, Lloyd testified that although he did not test the tray for fingerprints, it is far more likely that the tray— specifically the smooth surfaces on the interior of the tray—would have produced fingerprints.

¶ 20. State Crime Lab Forensic Scientist Chiara Weunsch ("Weunsch") testified that she tested swabbings taken from the revolver for DNA evidence. Although she was unable to recover any DNA evidence from the swabs, she, like Lloyd, testified that it is unusual to find DNA evidence on a firearm. Weunsch, like Lloyd, explained that the reason it is difficult to recover DNA evidence from a firearm is that it can easily be wiped away by handling or concealing of the firearm.

¶ 21. Marie Krentz ("Krentz"), co-owner of the SUV and Martin's girlfriend, testified at trial that she and Martin had purchased the used SUV from a Russ Darrow dealership on September 18, 2008, slightly less than two months before the events described above. Krentz testified that although she had test-driven the SUV before purchase and had regularly driven the vehicle since then, Martin was the primary driver of the vehicle, and she had never noticed the tray that contained the revolver. She further testified that the revolver did not belong to her.

¶ 22. At closing, the State reminded the jury of the uncontroverted facts regarding Smith's retrieval of the revolver and characterized the events that followed:

> You heard at that point that the police had to make a decision what to do. They had the two individuals: They had Mr. Henry and they had the defendant. They asked these individuals is this your gun, whose gun is this?
>
> You heard that both of them said "not mine" at which point it was determined that Mr. Henry would also be arrested and he was the passenger in the vehicle and the gun was found underneath his seat. At that point, not in response to a direct question at that point, but Mr. Martin stepped up. You heard the officer say something to the effect of step up or be — be the right

293

person, do the right thing here, in essence, at which point the defendant said, "That's my gun."

He didn't just say that; he described the weapon. He described it as black. Obviously apparent to the eye, obviously a black gun. No question about that.

He also described it as a .22–caliber weapon. Remember, I actually asked the officer about that, is this — obviously a .22–caliber weapon — if you just saw this? In fact, the officer said no, it actually appears to be a bigger one; it appears to be a .380 or some other type of weapon not a .22–caliber.

¶ 23. The State concluded its closing argument by asking the jury to look at "the circumstantial evidence in this case" as well as the direct evidence. Here, the State argued: 1) Martin was the co-owner of the vehicle, but the revolver did not belong to Krentz, the other co-owner; 2) although Henry was in the vehicle, he testified that the revolver did not belong to him; and 3) Martin had owned the vehicle for nearly two months.

¶ 24. Although Martin reiterated his theory of the case in his closing argument, he added a few additional arguments. He argued that his theory was bolstered by the fact that no fingerprints were found on the revolver, and that the tray was never tested for fingerprints. Additionally, he argued that the officers had not been consistent in their testimony about the incident.

¶ 25. After closing arguments, the jury retired to deliberate over the case. According to the trial transcript, "[w]ithin two minutes after going back, the jury buzzed and passed a note out." The court described the note in the following exchange:

The next thing written on the note is this: "Could we get the exact response — response from uncle [sic] when asked how Randy responded to officer's question, 'Is this your gun?' "

294

And then there's written just below that, "Response from officer when Randy was asked []'Is this your gun?' "[19]

¶ 26. The court, after consulting counsel for both the State and Martin, responded to the jury's question by reiterating that the jury would not be provided with a transcript of the trial testimony.[20] After approximately 30 minutes of deliberation, the jury returned a verdict of guilty on both counts.[21] The circuit court sentenced Martin to four years initial confinement and three years extended supervision for the felon in possession of a firearm count, and nine months on the concealed weapon count, to run concurrent with time served on the first count.

¶ 27. Martin appealed, alleging that the circuit court erred in determining that his statements were admissible and not taken in violation of *Miranda*. Martin argued that his "statements were the product of a [custodial] 'interrogation' and thus subject to *Miranda*." The court of appeals disagreed, and found that "Smith's comments to Martin at both points during this encounter were not 'designed' with the aim of eliciting incriminating testimony," *State v. Martin*, No. 2010AP505–CR, unpublished slip op. ¶ 19 (Wis. Ct.

[19] The jury also requested, in the same note, that certain exhibits from the trial be provided.

[20] The jury was instructed prior to the commencement of the prosecution's case in chief. At that point, the jury was provided with Wis JI—Criminal 58, which instructed the jury that transcripts of the trial testimony would not be available during its deliberation.

[21] After the conclusion of the trial and before sentencing, Martin moved the circuit court to reconsider his arguments made at the suppression hearing regarding the admissibility of the revolver. This question is not before the court.

App. May 3, 2011), and therefore no *Miranda* violation occurred. Martin appealed, and we granted review.

## III. STANDARD OF REVIEW

¶ 28. We apply a two-step standard of review when reviewing a motion to suppress. *State v. Eason,* 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625. First, we review the circuit court's findings of fact, and uphold them unless they are clearly erroneous. *State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. Second, we review de novo the application of constitutional principles to those facts. *Eason,* 245 Wis. 2d 206, ¶ 9.

## IV. DISCUSSION

¶ 29. We first consider whether a *Miranda* violation occurred and conclude that one did. We then take up the question of whether the error was harmless and answer that it was not. As a result, we reverse the court of appeals and remand for a new trial.

### A. There Was a *Miranda* Violation

¶ 30. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[22] The Fifth Amendment has been incorpo-

---

[22] Wisconsin affords suspects the same right in its state constitution. Wis. Const. Art. I, § 8 ("No person . . . may be compelled in any criminal case to be a witness against himself or herself"). Martin does not cite this provision in his briefs so we refer only to the Fifth Amendment. Regardless, we generally

rated to apply to the States through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 6 (1964).

■

¶ 31. In the seminal case of *Miranda v. Arizona,* the United States Supreme Court decided that the right protected by the Fifth Amendment requires that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Pursuant to that rule, a suspect cannot be subject to custodial interrogation until he is "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

¶ 32. It is undisputed that Martin was never advised of his *Miranda* rights. What is disputed is whether he was subject to custodial interrogation at the time he made the incriminating statements, and thus whether police were compelled to so advise him. We hold that Martin was subject to custodial interrogation

construe the state provision consistently with the United States Supreme Court's interpretation of the federal right. *State v. Jennings,* 2002 WI 44, ¶ 39, 252 Wis. 2d 228, 647 N.W.2d 142 ("Where the language of the provision in the state constitution is virtually identical to that of the federal provision or where no difference in intent is discernible, Wisconsin courts have normally construed the state constitution consistent with the United States Supreme Court's construction of the federal constitution.") (internal quotation marks, citation, and elipses omitted); *id.,* ¶ 40 ("The state constitutional right against compulsory self-incrimination is textually almost identical to its federal counterpart.") (footnote omitted).

during his exchange with law enforcement, and that the Constitution therefore compelled the officers to issue the warnings.

### 1. Martin Was in Custody for *Miranda* Purposes

■

¶ 33. The first question is whether Martin was in custody for *Miranda* purposes during his exchange with Smith. Law enforcement has custody over a suspect within the meaning of *Miranda* where a reasonable person would not feel free to terminate the interview and leave the scene. *Thompson v. Keohane,* 516 U.S. 99, 112 (1995).

■

¶ 34. We recognize that the use of handcuffs does not in all cases render a suspect in custody for *Miranda* purposes. Reasoning from that fact, the State submits that Martin was not in custody when he made the inculpatory statements but rather subject to a "temporary roadside detention." While it is true that Miranda warnings are not required during certain types of traffic stops, this was not such a circumstance. On the contrary, Fidler testified that when he placed handcuffs on Martin he was arresting him for disorderly conduct. Because "the safeguards prescribed by *Miranda* become applicable as soon as the suspect's freedom of action is curtailed to a degree associated with formal arrest," *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted), and because Martin had been placed under arrest, and was in handcuffs[23] and being questioned by the police (but not as part of an investigative stop or for officer safety

---

[23] *See United States v. Leshuk,* 65 F.3d 1105, 1109–10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing

reasons), his freedom was so curtailed. *See, e.g., State v. Eli,* 273 P.3d 1196, 1208 (HAW 2012) ("Defendant had been placed under arrest, and therefore was deprived of his freedom in a significant way" and thus in custody); *State v. Glass,* 136 S.W.3d 496, 508–09 (Mo. 2004) (en banc) ("A custodial interrogation occurs only when the suspect is formally arrested *or* is subject to arrest-like restraints.") (emphasis added) (citation omitted); *United States v. Lemon,* 550 F.2d 467, 471 (9th Cir. 1977) ("Appellant clearly was in custody *from the time he was placed under arrest . . . .*") (emphasis added); *United States v. Cartier,* 543 F.3d 442, 448 (8th Cir. 2008) ("In assessing whether Cartier was 'in custody' for *Miranda* purposes, we make a two-part inquiry: (1) was he formally placed under arrest *or* (2) was his freedom of movement restrained to the degree associated with a formal arrest.") (emphasis added). Consequently, this was not a "temporary roadside detention" and Martin was in custody for purposes of *Miranda.*

¶ 35. Lastly, we note that courts often apply a "totality of the circumstances" test to determine whether a suspect was in custody within the meaning of *Miranda. See State v. Mosher,* 221 Wis. 2d 203, 210–11,

---

a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes") (citations omitted). We do not understand the concurrence's confusion over "whether the [*Leshuk*] court was applying Fourth Amendment standards relating to arrest or Fifth Amendment standards relating to custody." Concurrence, ¶ 74 n.4. By its plain and unambiguous language, the Fourth Circuit indicated that it was applying the latter, given that it explicitly stated that it was considering whether the suspect was in custody "*for Miranda purposes,*" and therefore, by its terms, was applying Fifth Amendment standards. *Leshuk,* 65 F.3d at 1109–10 (emphasis added).

584 N.W.2d 553 (Ct. App. 1998); *State v. Gruen,* 218 Wis. 2d 581, 594–95, 582 N.W.2d 728 (Ct. App. 1998). Under such a test, courts consider "such factors as: the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." *State v. Morgan,* 2002 WI App 124, ¶ 12, 254 Wis. 2d 602, 648 N.W.2d 23. However, because Martin was placed under arrest, handcuffed and questioned by the police (but not as part of an investigative stop or for officer safety reasons), he was in custody within the meaning of *Miranda* and there is no need to examine the other factors in the test. *See* cases cited *supra* ¶ 34.

2. Martin Was Interrogated for *Miranda* Purposes

■■

¶ 36. We turn to the question of whether Martin was subjected to interrogation within the meaning of *Miranda.* Interrogation in this context occurs when the police ask a question of a suspect that is "reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz,* 496 U.S. 582, 600 (1990) (discussing "the functional equivalent of questioning"); *cf. United States v. Knope,* 655 F.3d 647, 652 (7th Cir. 2011) ("[T]he test for whether Knope was subject to interrogation [for *Miranda* purposes] is whether a reasonable objective observer would have believed that the *question* claimed by the defendant to have been unlawful interrogation was in fact reasonably likely to elicit an incriminating response.") (internal quotation marks, brackets, elipses, and citations omitted) (emphasis added), *cert. denied,* 565 U.S. __, 132 S. Ct. 1060 (2012); *United States v. Hogan,* 539 F.3d 916, 922 (8th Cir. 2008) ("These *questions* were reasonably likely to elicit an incriminating response from" the suspect and thus constituted interrogation under *Miranda*) (emphasis added). The

exchange at issue here began when Smith presented Martin with the revolver discovered in the vehicle and asked whether it belonged to him. Such a query is "reasonably likely to elicit an incriminating response;" indeed, it is a prototypical example of police interrogation. *See, e.g., United States v. Morales,* 611 F. Supp. 242, 244–46 (S.D.N.Y. 1985) (holding that an officer engaged in custodial interrogation within the meaning of *Miranda* when he showed a suspect drugs and asked "[w]hose are these?"), *rev'd in part on other grounds,* 788 F.2d 883 (2d Cir. 1986); *United States v. Hood,* 551 F. Supp. 2d 766, 771 (W.D. Ark. 2008) (holding that a detective engaged in custodial interrogation under *Miranda* when he asked three suspects who owned a rifle found during a protective sweep of an apartment).

¶ 37. The State contends that the initial question posed by Smith to the two suspects as to the revolver's ownership was not interrogation, but rather "general on-the-scene" questioning that did not need to be preceded by *Miranda* warnings. We disagree. The "on-the-scene" exception to *Miranda*'s requirement applies only when the person being questioned is not in custody, *Britton v. State,* 44 Wis. 2d 109, 113, 170 N.W.2d 785 (1969) (dealing with an individual questioned by a single officer trying to determine how to proceed in the aftermath of a murder when no suspects had been identified or handcuffed), or when law enforcement urgently needs information to attend to a potential emergency, *State v. Kraimer,* 99 Wis. 2d 306, 330, 298 N.W.2d 568 (1980) (dealing with an individual questioned by an officer concerning the whereabouts of his wife where there was reason to believe she might be in danger). Neither circumstance was present in this case. Martin was in custody, and there is no evidence that

301

there was any emergency. On the contrary, both suspects were secure and the revolver was in the possession of the police. As a result, the "on-the-scene" exception to *Miranda* has no bearing here and Martin was subjected to custodial interrogation.[24]

¶ 38. The court of appeals concluded that Martin was not interrogated because "the particular comments at issue here do not include Smith's initial confronting of Martin and Henry with the gun and do not include the first time when Smith asked them who owned the gun." *Martin,* No. 2010AP505–CR, ¶ 19. "Rather," the court of appeals continued, "at issue are Smith's comments after Martin asked the officers if they would let Henry go if Martin said the gun was his . . . ." *Id.* We respectfully disagree.

¶ 39. The court of appeals cited no authority for the proposition that an incriminating statement offered by a suspect who has not been Mirandized during the course of a custodial interrogation is admissible simply because that particular statement, viewed in complete isolation, appears "voluntary." Such authority does not exist for good reason. *Miranda* set forth a prophylactic rule. *See Howes v. Fields,* 565 U.S. __, 132 S. Ct. 1181,

---

[24] The State also suggests that Martin was not subject to interrogation because he was merely presented with evidence. *See State v. Hambly,* 2008 WI 10, ¶¶ 56–58, 307 Wis. 2d 98, 745 N.W.2d 48 (holding that police are entitled to show a suspect evidence without Mirandizing him in advance). Nevertheless, our inquiry focuses not on the fact that Martin was presented with the revolver, but on the fact that he was simultaneously asked whether it was his. Were we to conclude that officers can ignore *Miranda*'s dictate so long as they confront suspects with evidence while doing so, we would be stripping the United States Supreme Court's binding decision of any real force. We therefore decline to adopt the rule proposed by the State.

1188 (2012) ("*Miranda* adopted a set of prophylactic measures designed to ward off the inherently compelling pressures of custodial interrogation.") (internal quotation marks and citations omitted). The prophylactic power of the rule loses almost all force if a suspect can simply volunteer incriminating information during the course of a custodial interrogation without adverse consequences to the state. At that point, it is not a prophylactic rule at all, because it is entirely focused on the specific inculpatory statement, not on the fact that police officers are required to issue *Miranda* warnings *whenever* they ask a question "reasonably likely to elicit an incriminating response." *Muniz,* 496 U.S. at 600. Consequently, it is of no moment to our *Miranda* analysis that Martin's admission, viewed in a vacuum, appears to have been made voluntarily.

██ ██

¶ 40. At oral argument, the State proposed that Smith's second set of questions to Martin—those leading to the incriminating responses—were insulated from the *Miranda* error that infected the first question by an alleged gap between the two exchanges. It is true that there are situations in which a suspect is subjected to custodial interrogation without being Mirandized and then, at a later time, voluntarily offers inculpatory information free from the taint of the earlier *Miranda* violation. But in such cases there must be a break between the two exchanges, evidenced by factors like a lapse in time, change in personnel, change in location, or change in the content of the questions and answers. *See, e.g., United States v. Pettigrew,* 468 F.3d 626 (10th Cir. 2006); *United States v. Abdulla,* 294 F.3d 830 (7th Cir. 2002); *Medeiros v. Shimoda,* 889 F.2d 819 (9th Cir. 1989). Here, none of those factors militate in favor of finding a sufficient break. No significant amount of

time elapsed between Smith violating *Miranda* and Martin "volunteering" the inculpatory statements; in fact, both Fidler and Smith testified that the inculpatory statements were offered during the same exchange in which Smith asked the question in violation of *Miranda,* i.e., when he asked Martin whether the revolver was his. Furthermore, there was no change in personnel, no change in location, and no change in the subject-matter of the questions and answers. In short, there are no grounds to say that a break of any kind occurred between the *Miranda* violation and the inculpatory statements, let alone a break sufficient to dissipate the taint of the constitutional wrong. *Cf. People v. Chapple,* 341 N.E.2d 243, 245 (N.Y. 1975) (requiring "a definite, pronounced break" between a question asked in violation of *Miranda* and an inculpatory statement in order to render the latter admissible).[25]

---

[25] In support of its conclusion that Martin was not subjected to interrogation, the court of appeals cited the alleged fact that Smith asked the second set of questions—those leading to the incriminating responses—to "prevent[] a false confession" rather than to elicit incriminating evidence. *Martin,* No. 2010AP505–CR, ¶ 19. Because we determine that only one exchange took place for *Miranda* purposes, not two, it is not necessary for us to consider the separate import, if any, of Smith's remarks later in the exchange. Nevertheless, we note that there is no "false confession" exception to *Miranda*'s requirements. Indeed, as the court of appeals rightly recognized, a *Miranda* analysis "is *not* directed at the subjective intent of the police officer." *State v. Cunningham,* 144 Wis. 2d 272, 280, 423 N.W.2d 862 (1988) (emphasis added). Rather, the inquiry considers what police "*should* know" and on what is "reasonably *likely* to elicit an incriminating response from the suspect," not on what the officer intends or does not intend. *See Arizona v. Mauro,* 481 U.S. 520, 526–27 (1987) (internal quotation marks and citation omitted).

¶ 41. Accordingly, we conclude that Martin was in custody when asked whether the revolver belonged to him, and that the question constituted interrogation. Therefore, the officers were required to advise him of his *Miranda* rights prior to posing the question, and their failure to do so violated the Fifth Amendment. It follows as a matter of course that Martin's statements taken in violation of *Miranda* were inadmissible, and that it was error to admit testimony regarding those statements at trial. *Miranda,* 384 U.S. at 494.

### B. Harmless Error

¶ 42. We have concluded that the circuit court erred in admitting Martin's statements taken in violation of *Miranda,* and that Martin's constitutional rights were violated. However, that does not end our analysis, for we must now determine whether that constitutional error warrants automatic reversal, or should be subject to a harmless error analysis.

■■

¶ 43. The United States Supreme Court held in *Neder* that "most constitutional errors can be harmless." 527 U.S. at 8 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 306 (1991)). However, some constitutional errors are " 'structural,' and thus subject to automatic reversal, but only in a 'very limited class of cases.' " *Id.* accord *Harvey,* 254 Wis. 2d 442, ¶ 37. These structural errors are "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante,* 499 U.S. at 310; *see Neder*, 527 U.S. at 8. In other words, a structural error is one that affects a criminal trial in such a profound manner that the "trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and

305

no criminal punishment may be regarded as fundamentally fair." *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 577–78 (1986)).

¶ 44. However, a constitutional error may be harmless where it affects not the framework of the trial, but only the trial proceeding itself. *Neder*, 527 U.S. at 8. Put differently, harmless errors are described as those "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307. The majority of constitutional errors fall into this category, *see id.* at 306–07, and we have previously decided that the kind of error that occurred in this case—the admission of statements taken in violation of *Miranda*—is one of those errors. *Scales v. State,* 64 Wis. 2d 485, 492, 219 N.W.2d 286 (1974).

¶ 45. This court recently set forth the parameters for harmless error analysis in *Harvey,* 254 Wis. 2d 442, ¶ 46. There, we held that in order for an error to be deemed harmless, the party who benefited from the error must show that "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.,* ¶ 49 (quoting *Neder,* 527 U.S. at 18) (emphasis added, internal quotation marks omitted). As the party benefitted by the error, the State bears the burden of showing the error was harmless. *State v. LaCount,* 2008 WI 59, ¶ 85, 310 Wis. 2d 85, 750 N.W.2d 780. Framed a different way, an "error is harmless if the beneficiary of the error proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State v.*

*Mayo,* 2007 WI 78, ¶ 47, 301 Wis. 2d 642, 734 N.W.2d 115 (quoting *State v. Anderson,* 2006 WI 77, ¶ 114, 291 Wis. 2d 673, 717 N.W.2d 74) (internal quotation marks omitted); *State v. Stuart,* 2005 WI 47, ¶ 40, 279 Wis. 2d 659, 695 N.W.2d 259. Therefore, this court must be satisfied, beyond a reasonable doubt, not that the jury *could* have convicted the defendant (i.e., sufficient evidence existed to convict the defendant), *State v. Weed,* 2003 WI 85, ¶ 28, 263 Wis. 2d 434, 666 N.W.2d 485, but rather that the jury *would* have arrived at the same verdict had the error not occurred. *See Harvey,* 254 Wis. 2d 442, ¶ 46 (quoting *Neder,* 527 U.S. at 18).

■■■

¶ 46. Several factors assist this court's analysis of whether an error is harmless: the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case. *See Mayo,* 301 Wis. 2d 642, ¶ 48; *accord State v. Jorgensen,* 2008 WI 60, ¶ 23, 310 Wis. 2d 138, 754 N.W.2d 77. Although non-exhaustive, these factors aid the court in our review of whether the error complained of in this case—the introduction of Martin's statements taken in violation of *Miranda*— was harmless. We review each in turn.

### 1. The Frequency of the Error

¶ 47. The first factor we evaluate is whether the error in this case occurred often, or whether it occurred but infrequently. The record in this case could not be clearer: the use of Martin's improperly admitted state-

ments by the State at trial was pervasive. Martin's statements were discussed at length in both the State's opening statement and closing argument, and Fidler, Smith, and Henry were each questioned extensively regarding Martin's statements. In fact, a significant portion, if not a majority, of Smith's testimony revolved around Martin's un-Mirandized statements. Henry's testimony, likewise, centered on those statements. Given these facts, as evident out in the record, it is clear that the error complained of here was frequent, so frequent that it became the backbone of the State's argument.

### 2. The Importance of the Erroneously Admitted Evidence

¶ 48. It is difficult to determine what weight, and therefore what importance, the jury placed on the erroneously admitted evidence regarding Martin's statements. However, it appears that that evidence was important for three reasons.

¶ 49. First, we can be certain, based on the record and confirmed by the prosecutor's statements at closing argument, that without Martin's statements, the State's case was lacking in direct evidence. To be clear, if we disregard Martin's statements, the best argument the State available to the State to establish that Martin had knowing control over the revolver, as required by Wis. Stat. § 941.29(2), would have been entirely circumstantial: that the revolver was in Martin's vehicle, and that both Krentz (the co-owner) and Henry (the passenger) denied ownership.

¶ 50. Second, the State thought that the improperly admitted evidence, Martin's statements, was important enough to the case that it highlighted them in

308

both its opening statement and closing argument. The State could have chosen to include arguments that did not rely upon Martin's statements; however, it based its case on Martin's admissions.

¶ 51. Finally, while the court cannot "conduct a subjective enquiry into the jurors' minds," *Yates v. Evatt,* 500 U.S. 391, 404 (1991), *disapproved on other grounds by Estelle v. McGuire,* 502 U.S. 62, 72 n.4 (1991), we can be relatively certain that this jury did in fact rely on the erroneously admitted evidence. This is so because the record reflects that no more than two minutes after the jury retired to deliberate on Martin's case, it sent written questions to the court asking for the exact language of both Smith's questions of Martin, and Martin's responses. It is safe to say that if the jury felt that Martin's statements were significant enough to request additional clarification, it placed a high importance on them. *See Stuart,* 279 Wis. 2d 659, ¶ 52–53 (listing a jury's question regarding testimony at trial as one indication that the jury relied upon that testimony).

¶ 52. Accordingly, while it is possible that the erroneously admitted evidence was not important to the State's case or to the jury's determination, the record establishes that it is far more likely that it was important to both, playing heavily into the jury's determination of Martin's guilt.

### 3. The Presence or Absence of Evidence Corroborating or Contradicting the Erroneously Admitted Evidence

¶ 53. The record reflects that there was very little evidence to corroborate or contradict Martin's statements. No other evidence introduced at trial corroborates Martin's admission that the revolver belonged to

him; the best evidence the State could provide was that Krentz (the co-owner) and Henry (the passenger) denied ownership of the revolver. In fact, no witness at the trial was able to testify that the revolver belonged to Martin, or even that Martin knew about the revolver. Additionally, the State was unable to provide DNA or fingerprint evidence linking Martin—or any other person—to the revolver.

¶ 54. While there is little to corroborate Martin's statements, there is a significant amount of evidence that contradicts his claim of ownership of the revolver. Smith testified that he initially began to arrest Henry, not Martin, for possession of the revolver, because he believed that the revolver belonged to Henry. Smith's testimony indicated that he began to arrest Henry because he was "sitting basically on top of this weapon." Smith was dissuaded from arresting Henry only when Martin interrupted the arrest to admit ownership of the revolver. The only reasonable inference that may be drawn from this testimony is that Smith initially believed that Henry, not Martin, was responsible for control of the firearm.

¶ 55. Further, the testimony of Krentz, a co-owner and frequent user of the SUV, and Henry, the passenger who had ridden in the SUV multiple times, indicated that neither of them had ever seen the tray before the events incident to Martin's arrest. Additionally, both Fidler and Smith testified that the tray, while visible, was difficult to see. Therefore, it would not be unreasonable for the jury to have found, absent Martin's admission, that no one—Krentz, Henry, or Martin—knew of the revolver's existence before the arrest.

¶ 56. Accordingly, our review of the record reveals that there is little, if any, evidence that corroborates

Martin's inadmissible testimony, but a significant amount of evidence that contradicts his statements.

### 4. Whether the Erroneously Admitted Evidence Duplicates Untainted Evidence

¶ 57. The erroneously admitted evidence does not duplicate untainted evidence. In short, while there is some circumstantial evidence that might suggest that the revolver belonged to Martin, the record reflects no direct evidence introduced at trial to establish that Martin owned the revolver, knew the revolver was in the vehicle, or had ever even seen the revolver. The record does not reflect whether Martin admitted to possession of the revolver at any other time, and in any event, no such evidence was presented to the jury. Therefore, the silence of the record makes it clear that the erroneously admitted evidence does not duplicate untainted evidence.

### 5. The Nature of the Defense

¶ 58. Martin's defense at trial was that he and Krentz had purchased the SUV less than two months before the events incident to his arrest, and that he had never seen the tray before those events. Therefore, Martin argued, the revolver must have been in the tray when he purchased the vehicle, unbeknownst to him.

¶ 59. The State argued at closing that Martin's argument did not make "common sense." It may or may not be difficult to believe that an individual who owns a used SUV for two months would be unaware of the presence of contraband located under the front passenger seat of the vehicle. However, absent Martin's statements, the State presented no evidence that directly

contradicted Martin's theory, or that made his theory less likely. In short, most of the admissible evidence is consistent with Martin's theory of the case.

### 6. The Nature of the State's Case

¶ 60. The State's case, as presented to the jury, centered on Martin's statements. It is best summarized by the prosecutor's opening statements regarding the felon in possession charge, where he stated:

> [O]fficers ... searched the vehicle of [Martin], ... a vehicle which he co-owned with another individual. In that vehicle, you will hear, a .22 caliber revolver was found under the seat of the vehicle. You will hear questions were asked about that weapon. As a matter of fact, the defendant admitted that it was his gun. He even described the weapon when asked the type of weapon it was.

Clearly, the State's case was focused on Martin's statements.

¶ 61. Notably, the State did not present a constructive possession argument to the jury at any point. Instead, the State argued that: 1) Martin knew that the revolver was in the vehicle, as established by his statements, and 2) the revolver belonged to Martin, as established by his statements, and as verified by his statements describing the revolver. Therefore, Martin's inadmissible statements comprised the central component of the State's case, and the only proof that Martin had knowing control over the revolver.

### 7. The Overall Strength of the State's Case

¶ 62. The strength of the State's case is inextricably tied to Martin's statements. If Martin's statements had been properly admitted, the State would have had

a strong case that established that Martin had knowing control over the revolver, and was therefore guilty of the felon in possession of a firearm charge.

¶ 63. However, absent Martin's statements, the strength of the State's case erodes significantly. Without Martin's statements, the State would have had the unenviable task of attempting to prove—with no direct evidence—that Martin had knowing control of the revolver. The State could provide no other testimony establishing that the revolver belonged to Martin, or provide physical evidence (fingerprints or DNA) linking the revolver to him. Therefore, outside of Martin's statements, the State's case would be based entirely on the circumstantial inferences drawn from Krentz and Henry's denials of ownership of the revolver.

¶ 64. Essentially, the State would be left arguing that because Krentz and Henry both stated that the revolver did not belong to them, the revolver must have belonged to Martin. Yet, the State would have to rebut —with little supporting evidence—the argument that the revolver was in the SUV when Martin purchased it, and he simply did not know it was there. Therefore, it is apparent that without Martin's statements, the State's case is not strong and entirely reliant on circumstantial evidence.

¶ 65. To summarize, all of the factors that aid in our harmless error analysis direct that the error complained of in this case was not harmless. First, Martin's statements were repeatedly used throughout trial. Second, the State and the jury clearly found Martin's statements important; so much so that the State based its entire theory of the case on these inadmissible statements, and the jury sought clarification on them. Third, there was little evidence that corroborated

Martin's admission that the revolver was his, but a significant amount of evidence contradicted his statement. Fourth, the content of Martin's statements—his admission of guilt—did not duplicate otherwise admissible evidence. Fifth, the nature of Martin's defense, while perhaps improbable, was at least plausible, and was consistent with most of the admissible evidence. Sixth, the nature of the State's case focused entirely on Martin's statements. Finally, the overall strength of the State's case is significantly weaker absent Martin's improperly admitted statements.

¶ 66. The State contends that these concerns can all be overcome because it needed to prove only that Martin constructively possessed the firearm—meaning that he exercised knowing control over the revolver— and that it need not prove that the revolver belonged to him. The State argues that it is clear that Martin had constructive possession of the revolver because Martin was the primary driver of the vehicle and both Krentz and Henry denied that the revolver belonged to either of them. Even if the revolver belonged to Henry, the State submits, Martin could share constructive possession and therefore knowingly control the revolver.

¶ 67. While we agree generally with the State's argument that it would have needed to prove only constructive possession, its argument fails in the context of this case. For the State did *not* argue constructive possession at trial; it chose to rely on Martin's inadmissible statements. While the State undoubtedly made a tactical decision to rely on Martin's statements rather than pursue a constructive possession argument, our review is limited to whether it is clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Anderson,* 291

Wis. 2d 673, ¶ 114; *see Harvey*, 254 Wis. 2d 442, ¶ 49. Accordingly, we must evaluate the record at trial, absent the testimony regarding Martin's improperly admitted statements, to determine whether it is clear beyond a reasonable doubt that the jury would have convicted Martin.

¶ 68. At trial, the State attempted to establish that Martin had actual possession of the revolver by proving that he owned it. The State now asks us to evaluate an entirely different argument—a constructive possession argument that it did not make at trial—to determine whether the jury could have convicted Martin. However, a proper harmless error analysis does not extend to whether it is possible, had the State offered a different argument on the same facts, that the jury would have convicted the defendant. Instead, the analysis is cabined to whether it is clear beyond a reasonable doubt that the jury, based on what it heard and saw at trial, would have convicted Martin absent the error. This is so because all seven factors that we have evaluated to determine whether an error is harmless relate to what was *actually* presented at trial, not what the parties *could have* presented at trial. Accordingly, we cannot decide that harmless error did not occur based on an argument not presented to the jury.

¶ 69. In summary, the record "underscore[s] the importance of the admitted evidence." *Stuart,* 279 Wis. 2d 659, ¶ 57. In light of the foregoing, there is reason to doubt whether the jury, hearing only the evidence at trial absent the error, would have convicted Martin on the felon in possession of a firearm count. Therefore, the State has not met its burden of demonstrating that it is clear beyond a reasonable doubt that

the jury would have convicted on the felon in possession charge Martin absent the error. Accordingly, we conclude that the error in this case—the admission of Martin's statements taken in violation of *Miranda*—is not harmless as it relates to the felon in possession charge.[26]

## V. CONCLUSION

¶ 70. Because Martin made incriminating statements while in police custody and while being subjected to interrogation by police officers, we conclude that he had a Fifth Amendment right to receive *Miranda* warnings. Accordingly, we hold that it was error to admit the incriminating statements at trial. Further, we hold that because the State has not met its burden of proving that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error," *Harvey,* 254 Wis. 2d 442, ¶ 49 (quoting *Neder,* 527 U.S. at 18), the error was not harmless. Accordingly, we reverse the decision of the court of appeals and remand the cause for a new trial.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for a new trial.

¶ 71. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I agree with the majority's conclusions that there was a *Miranda* violation in the present case and that the error in failing to suppress the defendant's statements taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966), was *not* harmless.

---

[26] However, the error was harmless with respect to the concealed weapons charge because all of the evidence relating to that charge remains admissible. Further, neither party has argued the validity of that conviction.

¶ 72. I write separately to briefly elaborate on the majority's discussion of "custody" for purposes of *Miranda* and to make a couple of cautionary points. *See* majority op., ¶¶ 33–35.[1]

¶ 73. Whether a suspect is "in custody" for purposes of *Miranda* is a fact-specific inquiry that depends on a variety of factors.[2] The overarching question, as the majority notes at ¶ 33, is whether "a reasonable person would not feel free to terminate the interview and leave the scene."

¶ 74. Despite the overarching question, it is well established that police may conduct brief stops of individuals, such as traffic stops, during which a reasonable suspect would not feel free to leave, but which do not require *Miranda* warnings.[3] If, however, "other factors indicate the presence of a coercive atmosphere," the suspect is considered to be "in custody" for purposes of *Miranda*.[4]

---

[1] The majority's holding in ¶¶ 33–35 is simply that when an officer arrests a suspect, the suspect is necessarily "in custody" for purposes of *Miranda.*

[2] Wayne R. LaFave, *Criminal Procedure* § 6.6(c) (3d ed. 2000) ("[A] determination of whether the situation was 'custodial' for *Miranda* purposes will often require a careful examination of all the circumstances of the particular case.").

[3] *See, e.g., Berkemer v. McCarty,* 468 U.S. 420 (1984). *See also* Wayne R. LaFave, *Criminal Procedure* § 6.6(c) (3d ed. 2000) ("Under *Berkemer,* the question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest.").

[4] *See The Georgetown Law Journal's Thirty-Sixth Annual Review of Criminal Procedure* 173–74 (2007).

The majority at ¶ 34 n.23 provides the following quote from a Fourth Circuit case: "[D]rawing weapons, handcuffing

¶ 75. Each case must be decided on its own unique facts. Law enforcement officers may decide to use handcuffs to protect themselves and maintain order during some brief detentions. In such cases, courts should consider the use of handcuffs as a factor in determining the coerciveness of the atmosphere and in determining whether the brief detention should be considered "custody" for purposes of *Miranda* and the Fifth Amendment.

¶ 76. Complicating matters, these brief detentions may implicate Fourth Amendment requirements regarding *arrests* as well as *Miranda*'s Fifth Amendment rule. The Fourth Amendment "arrest" standard and the Fifth Amendment "in custody" standard are related, but not identical. Although a suspect who is arrested is necessarily "in custody" for purposes of *Miranda,* the converse is not always true. It is possible for a suspect to be "in custody" for purposes of *Miranda* without being arrested. *See, e.g., United States v.*

a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes." *United States. v. Leshuk,* 65 F.3d 1105, 1109–10 (4th Cir. 1995).

*Leshuk* was not describing a single case in which all of those factors were present and yet the suspect was not "in custody" for purposes of *Miranda.* Rather, *Leshuk* compiled the fact situations and holdings from a number of prior cases. In *Leshuk* itself, the officers did not draw their weapons, did not handcuff the suspects, did not place the suspect in a patrol car, and did not use or threaten to use force. The *Leshuk* court concluded that the officers' conduct was "neither coercive nor intimidating." *Leshuk,* 65 F.3d at 1110. .

Additionally, *Leshuk*'s reference to "custodial arrest for *Miranda* purposes" makes it somewhat unclear whether the court was applying Fourth Amendment standards relating to arrest or Fifth Amendment standards relating to custody.

318

*Martinez,* 462 F.3d 903, 907, 909 (8th Cir. 2006) (holding, on the one hand, that "the cuffing did not convert the *Terry* stop into an arrest" and holding, on the other hand, that "we find [the defendant] was in custody at the time he was handcuffed").

¶ 77. It is possible that some past cases have cited Fourth Amendment cases while deciding Fifth Amendment issues or cited Fifth Amendment cases while deciding Fourth Amendment issues.[5] Going forward, this court should be cautious to avoid conflating closely related constitutional standards and analyses.

¶ 78. For the reasons set forth, I write separately.

¶ 79. ANN WALSH BRADLEY, J. (*concurring*). I join the majority opinion with the exception of footnote 23. Unfortunately, that footnote detracts from what is otherwise a very good opinion.

[5] For example, *United States v. Booth,* 669 F.2d 1231, 1236 (9th Cir. 1981) held that "[h]andcuffing a suspect does not necessarily dictate a finding of *custody*" (emphasis added). Yet, for that proposition, *Booth* cited *United States v. Purry,* 545 F.2d 217, 219 (D.C. Cir. 1976), which was a case asking whether a suspect was *arrested* without probable cause. *Purry* did not cite *Miranda* once or discuss the meaning of "in custody" for purposes of *Miranda.*