DAVID T. PROSSER, J.
¶ 73. (dissenting). The majority opinion has been constructed to present a black and white picture of a reckless defendant. Unfortunately, there is more to the story. The facts left out are not pretty, and their ugliness helps explain why a Kenosha County jury deliberated about 20 hours, over four days, before reaching a verdict.
¶ 74. When a jury deliberates for 20 hours on a seemingly simple case, something about the case has troubled them. When a jury has deliberated for 20 hours before convicting a defendant, facile assurances that critical errors in the trial were harmless to that defendant can be unpersuasive and unsettling. For the reasons stated below, I believe this defendant should be given a new trial. Consequently, I respectfully dissent.
FACTUAL BACKGROUND
¶ 75. The defendant in this case, Luis M. Rocha-Mayo, was 19 years old at the time of the accident. He was an undocumented immigrant from Mexico whose primary language is Spanish and who required an interpreter throughout the criminal proceedings. The jury knew that many months had passed between the *114 charges and the trial.[1] None of this affected the jury's conscientious consideration of the case.
¶ 76. On June 21, 2008, the defendant was at his apartment with family. Between 7 p.m. and 9 p.m. he consumed three beers. About 9 p.m., the group traveled in separate cars to El Rodeo, a bar at the corner of 14th Avenue and 52nd Street in Kenosha. Over the next five hours, the defendant consumed five beers and ordered a sixth, which he partially consumed at the bar and took with him to finish in his car when he left at 2 a.m.
¶ 77. Thus, between 7 p.m. on June 21 and 2 a.m. on June 22 — seven hours — the defendant consumed at least nine beers. He claimed also that between the initial three beers and the last six beers he drank some soda. The defendant's drinking is not in dispute; the effect of his drinking is.
¶ 78. When the defendant left El Rodeo, he pulled his vehicle onto 52nd Street and proceeded west, intending to return to his apartment on 40th Avenue. Within a few blocks, three motorcycles entered 52nd Street from the parking lot for Coins Tavern, which has an address of 1714 52nd Street.
¶ 79. The defendant's version of the story is that a motorcycle carrying two people, Curtis Martin (Martin) and Shawna Bestwick (Shawna), merged into the right lane directly in front of the defendant's vehicle. Two other motorcycles then entered the street immediately behind the defendant's vehicle. One of these cycles was driven by Travis Bestwick (Bestwick); the other was driven by Jason Walters (Walters). Bestwick was Shawna's brother. He was riding Martin's motorcycle, *115 and Martin was riding Bestwick's motorcycle, because Bestwick's cycle was better suited for carrying a passenger.
¶ 80. The motorcyclists had been riding as a group, and apparently Bestwick and Walters became offended when members of the group were separated by Rocha-Mayo's car. Walters pulled up parallel to the defendant's car, alongside the driver's window. He yelled at Rocha-Mayo with an obscenity and gestured for him to pull over. Martin and Shawna heard the yelling behind them and then turned off on 25th Avenue in a maneuver that enabled them to end up behind the defendant's car with the other motorcycles. The defendant's brief reads in part as follows:
At this point, Rocha Mayo testified, he sensed Walters and his group were looking for trouble and the situation felt threatening. Realizing he now had three cycles around him, and believing them all in a mood to harm him, Rocha Mayo did not pull over as Walters demanded. Instead, he resolved to continue home, which required he remain on 52nd Street and turn right at 40th Avenue. He therefore continued westbound at the approximate speed limit, just hoping to get home.
¶ 81. Walters pulled back behind Rocha-Mayo's car. He reached into his jacket for an expandable metal baton and flicked it open with the wrist of his right hand. He then accelerated his bike to the left of the defendant's car and launched the metal baton at the car's rear window while traveling at high speed. The baton shattered the rear window of the car and landed on the floor in front of the passenger's seat. Glass fragments flew throughout the car. Bestwick followed Walters past the defendant's car. The defendant's brief explains:
*116 From Rocha Mayo's perspective, his premonition of danger suddenly became a rude reality when his rear window exploded as two cycles roared by him on the left. The explosion caused Rocha Mayo to momentarily duck and he was convinced he was going to get hit. When he regained his wits, he instinctively accelerated because another cycle was behind him, in addition to the two cycles now in front of him, and he was scared. He feared another assault from the rear. Although still in the right lane and somewhere near 30th and 33rd Avenues, he resolved not to turn off on 40th Avenue so the cyclists would not learn where he lived.
¶ 82. After Walters' baton shattered RoehaMayo's window, Rocha-Mayo and the two motorcycles in front of him speeded westward on 52nd Street at approximately 70 miles per hour. The third motorcycle followed for several blocks, then turned off on 39th Avenue. Rocha-Mayo testified, however, that he continued to believe he was being pursued by the third cycle, so that he thought he had two cycles ahead of him and one cycle behind him. As noted, he did not slow down to turn off on 40th Avenue, allegedly because he was afraid he would be followed to his apartment.
¶ 83. The ostensible "race" with the three vehicles on 52nd Street continued for more than 20 blocks until the vehicles came to the intersection with Green Bay Road. The defendant's brief reads as follows:
As the vehicles approached that intersection, the stop light for westbound traffic was red .... The two westbound lanes, that were also free of traffic, widened first to three lanes (a dedicated left turn lane) and then to four lanes (a shorter dedicated right turn lane). ... Rocha Mayo believed he still had a third cycle behind him.. . .
As the vehicles neared the intersection, Bestwick and Walters, via hand signals (but unbeknownst to *117 Rocha Mayo), decided to attempt a right turn onto North Green Bay Road, a maneuver the State's accident investigator agreed would have heen impossible at their speed. Rocha Mayo was still in the right hand lane and from his perspective, Walters and Bestwick were off to the left in front of him. Suddenly Walters braked, but realized a turn would be impossible, and wound up sliding into and stopping in the middle of the intersection. Bestwick, however, attempted the turn and moved to the right, directly in front of Rocha Mayo's vehicle, while braking. Rocha Mayo could not react fast enough to avoid striking Bestwick.
¶ 84. Rocha-Mayo's vehicle collided with Bestwick's motorcycle. Bestwick, who had not been wearing a helmet, was thrown from the cycle and eventually died of blunt force trauma to the head. Rocha-Mayo was injured in the crash, was found by police lying in pain in nearby grass, and like Bestwick, was transported to a hospital.
¶ 85. Walters, according to testimony at the trial, came to a complete stop in the intersection, looked around from the vantage point where he could see both vehicles at a complete rest, with Bestwick lying in the street. Walters then took off southbound on Green Bay Road as a police car approached.
¶ 86. Walters called Shawna about the accident, and she and Martin quickly drove to the accident scene. However, they left without telling police of their knowledge or involvement and waited more than 19 hours before contacting authorities. When they came to talk, the motorcyclists blamed the tragic events entirely on Rocha-Mayo. Whether the motorcyclists had been operating under the influence was never established, in large part because they absented themselves from au *118 thorities. None of the motorcyclists, including the baton-launching Walters, was ever charged with any offense.[2]
¶ 87. Bestwick died on Sunday, June 22, 2008. The following day, Rocha-Mayo was charged with second-degree reckless homicide with a dangerous weapon, contrary to Wis. Stat. §§ 940.06(1), 939.50(3)(d), and 939.63(1)(b), a Class D felony.
¶ 88. Following a preliminary examination on July 2, 2008, the State filed an information charging Rocha-Mayo with three offenses:
(1) First-degree reckless homicide, with use of a dangerous weapon, contrary to Wis. Stat. §§ 940.02(1), 939.50(3)(b), and 939.63(l)(b), a Class B felony instead of the Class D felony originally charged.
(2) First-degree reckless endangerment, with use of a dangerous weapon, contrary to Wis. Stat. § 941.30(1), 939.50(3)(f), and 939.63(l)(b), a Class F felony. The information asserted that Rocha-Mayo "did recklessly endanger the safety of Jason A. Walters, under circumstances which show utter disregard for human life."
(3) Operating without a valid license causing death to another person, contrary to Wis. Stat. §§ 343.05(5)(b)3d and 939.51(3)(a), a Class A misdemeanor.
¶ 89. Seven months later, on February 11, 2009, the State moved the circuit court to amend the information to add a fourth charge of homicide by intoxicated use of a motor vehicle, contrary to Wis. Stat. §§ 940.09(1)(a) and 939.50(3)(d), a Class D felony. The *119 motion was granted by Circuit Judge Bruce Schroeder. In his motion, District Attorney Robert Zapf wrote:
At the court hearing on the defendant's motion to adjourn the trial date, the Court inquired whether the State was intending to pursue any alcohol related charges. At that time, this writer advised the Court that I did not think the BAC test performed by the hospital would be admissible. However, your affiant has reviewed all of the evidence and reconsidered its original position.
¶ 90. Rocha-Mayo thereafter successfully moved Judge Schroeder to recuse himself from the case. Judge Wilbur W Warren III was assigned to the case.
¶ 91. The facts stated above closely follow the defendant's brief and obviously convey the defendant's perspective on some of the facts. Significantly, however, the State did not rewrite the statement of facts. Rather, the State said:
Rocha-Mayo's statement of facts consists largely of facts about the criminal incident itself, from the viewpoint most favorable to him. Because the criminal incident facts are not directly pertinent to the legal issues, the State will not present a counter statement of criminal incident facts. By declining to do so, the State does not in any way intend to agree with Rocha-Mayo's partisan presentation of the facts. The evidence presented, viewed in the light most favorable to the State as it must be after conviction, was sufficient to prove Rocha-Mayo guilty beyond a reasonable doubt.
¶ 92. The facts above, presented in large part from the defendant's perspective, are damaging to the defendant. But they also suggest the possibility that Bestwick's tragic death would not have happened but for actions initiated by Walters and the other motorcy *120 clists. This was Rocha-Mayo's explanation from the day of his arrest and his defense throughout the trial. It underlies his position now. Consequently, the issues presented in this review are integrally related to the specific felonies with which Rocha-Mayo was charged and convicted, and the specific facts leading up to Bestwick's death. If the issues presented by the defendant reveal errors in the trial, it is very, very difficult to assert that these errors did not "contribute" to the verdict.
ADMISSIBILITY OF THE PBT RESULT
¶ 93. Rocha-Mayo states his first issue as follows: "whether Wisconsin's breath testing regimen allows the State to present evidence of a PBT result in an OWI prosecution to quantitatively prove the defendant was under the influence of an intoxicant, simply because the PBT was not administered by law enforcement."
¶ 94. Following the accident, Rocha-Mayo was taken to the emergency room at St. Catherine's Medical Center. The State's brief states that Rocha-Mayo was strapped to a backboard and had swollen lips and blood on his face; he was confused and emitted an obvious odor of alcohol. The State's brief goes on to describe how Dr. William Falco, the emergency room doctor, almost immediately ordered the emergency room nurse, Steven Edwards, to do a breath alcohol test to try to determine whether Rocha Mayo's confusion was caused by a head injury or alcohol. The defendant's brief states, "Nurse Edwards complied, Rocha Mayo consented and cooperated, and a PBT test result of 0.086 was taken. It was a single sample test."
¶ 95. Prior to trial, Rocha-Mayo moved to suppress the result of the PBT obtained at the hospital emergency room. Rocha-Mayo argued that the result of *121 the test was inadmissible under Wis. Stat. § 343.303. After a hearing, the circuit court disagreed and admitted the test result at trial.
¶ 96. This issue — the admissibility of the PBT result in a trial involving traffic-related offenses, including homicide by intoxicated use of a motor vehicle — is surely the reason the court took this case. Significantly, no one on the court is prepared to say that the circuit court correctly admitted the evidence.
¶ 97. In State v. Fischer, 2010 WI 6, ¶ 4, 322 Wis. 2d 265, 778 N.W.2d 629, the court unanimously held that "Wisconsin Stat. § 343.303 expressly bars PBT results in OWI cases." After joining the opinion, Justice Ziegler concurred, stating, "I conclude that as a matter of law PBT results are neither reliable nor admissible for the purpose of confirming or dispelling a defendant's specific alcohol concentration in an OWI or PAC trial." Id., ¶ 37 (Ziegler, J, concurring, joined by Justices Roggensack and Gableman).
¶ 98. In her concurrence in the present case, Justice Ziegler adds that "the legislature has spoken and PBT results are not admissible for the purpose of confirming or dispelling intoxication or a specific alcohol concentration when these considerations are an element of the crime." Concurrence, ¶ 43.
¶ 99. Against this background, the majority nonetheless is willing to decide the case by assuming, without deciding, "that the circuit court erred when it allowed the State to admit, as evidence, the PBT result obtained by a medical professional for diagnostic purposes," majority op., ¶ 4, and then affirming Rocha-Mayo's convictions on the basis of harmless error.
¶ 100. In this case, assuming error rather than deciding error has the unfortunate effect of ducking a *122 vital issue that should be decided and burying the reasons for an "inadmissibility" ruling.
¶ 101. Wisconsin Stat. § 343.303 reads as follows:
Preliminary breath screening test. If a law enforcement officer has probable cause to believe that the person is violating or has violated s. 346.63(1) or (2m) or a local ordinance in conformity therewith, or s. 346.63(2) or (6) or 940.25 or s. 940.09 where the offense involved the use of a vehicle, or if the officer detects any presence of alcohol, a controlled substance, controlled substance analog or other drug, or a combination thereof, on a person driving or operating or on duty time with respect to a commercial motor vehicle or has reason to believe that the person is violating or has violated s. 346.63(7) or a local ordinance in conformity therewith, the officer, prior to an arrest, may request the person to provide a sample of his or her breath for a preliminary breath screening test using a device approved by the department for this purpose. The result of this preliminary breath screening test may be used by the law enforcement officer for the purpose of deciding whether or not the person shall be arrested for a violation of s. 346.63(1), (2m), (5) or (7) or a local ordinance in conformity therewith, or s. 346.63(2) or (6), 940.09(1) or 940.25 and whether or not to require or request chemical tests as authorized under s. 343.305(3). The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3). Following the screening test, additional tests may be required or requested of the driver under s. 343.305(3). The general penalty provision under s. 939.61(1) does not apply to a refusal to take a preliminary breath screening test.
*123 ¶ 102. The most important sentence in this section is: "The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3)." Id. (emphasis added).
¶ 103. The title of § 343.303 is "Preliminary breath screening test." The phrase "preliminary breath screening test" appears four times in the text of the section. The key word among the four words is "preliminary," and that word is wholly consistent with the expectation that "additional tests may be required or requested of the driver under s. 343.305(3)." Id.
¶ 104. Wisconsin Stat. § 343.305 is entitled "Tests for intoxication; administrative suspension and court-ordered revocation." This section outlines the tests for intoxication that are admissible in evidence in traffic-related prosecutions. Wisconsin Stat. § 343.305(5)(d) provides in part:
[T]he results of a test administered in accordance with this section are admissible on the issue of whether the person was under the influence of an intoxicant... to a degree which renders him ... incapable of safely driving ... or any issue relating to the person's alcohol concentration. Test results shall be given the effect required under s. 885.235.[3]
These tests include taking a sample of the person's *124 breath, consistent with the "techniques or methods of performing chemical analysis of the breath" set out in Wis. Stat. § 343.305(6)(b) and (c).
¶ 105. The Department of Transportation's (DOT) administrative rules, as required by statute, Wis. Stat. § 343.305(6)(b), spell out in detail the approved techniques and methods for performing chemical analysis of the breath. See Wis. Admin. Code § TRANS 311.06 (Mar. 2012). Much of Rocha-Mayo's argument seeks to show that the test taken at the hospital emergency room, the result of which was admitted at trial, did not satisfy the requirements set out in statute and rules, thereby rendering the result not only inadmissible but also unreliable.
¶ 106. The distinction between breath tests admissible under Wis. Stat. § 343.305(5)(d) and Wis. Stat. § 885.235 and PBTs inadmissible under Wis. Stat. § 343.303 is highlighted in Wis. Admin Code § TRANS 311 in the definition section, which distinguishes "Quantitative breath alcohol analysis" from "Qualitative breath alcohol analysis."
¶ 107. " 'Qualitative breath alcohol analysis' means a test of a person's breath, the results of which indicate the presence or absence of alcohol." Wis. Admin. Code § TRANS 311.03(12) (Mar. 2012)." 'Quantitative breath alcohol analysis' means a chemical test of a person's breath which yields a specific result in grams of alcohol per 210 liters of breath." Wis. Admin. *125 Code § TRANS 311.03(13) (Mar. 2012). Wisconsin Admin. Code § TRANS 311.06(2) explains that "[techniques used in performing quantitative breath alcohol analysis shall be those which are designed to assure accuracy, detect malfunctions and to safeguard personnel and equipment." (Emphasis added.) Wisconsin Admin. Code § TRANS 311.06(5) provides only that "[m]ethods and techniques used in performing qualitative breath alcohol analysis shall be approved by the department." (Emphasis added.)
¶ 108. In testimony at trial, Susan Hackworthy, chief of the chemical test section, Division of State Patrol, in the DOT, explained that "The qualitatives are PBT and the quantitatives are evidential." She also testified that the Aleo-Sensor iy the PBT device used at St. Catherine's Medical Center, is not certified by the DOT for evidentiary use in Wisconsin courts and that the DOT does not certify breath testing devices in the private sector.
¶ 109. Rocha-Mayo's trial counsel cross-examined Hackworthy on various procedures in the administrative rules designed to assure accuracy in test results and to avoid error — procedures that are required to be followed in "evidential" tests but are not part of the ordinary regimen for PBTs. The State's expert grudgingly acknowledged: "A preliminary breath test is generally not allowed in an OWI trial in front of a jury." She further acknowledged in response to hypothetical questions that in the absence of certain protocols, a breath test would not satisfy State Patrol guidelines for evidence. In this case, several of the protocols were not met in the hospital PBT, including an assurance that Rocha-Mayo did not have an unusual amount of mouth alcohol because of his recent drinking or the accident, which affected both his head and his chest.
*126 ¶ 110. To sum up, Wis. Stat. § 343.303 provides that a preliminary breath screening test is not admissible in any action or proceeding except as authorized by that statute. When court decisions have deviated from this statutory directive, they have deviated only in cases that did not involve traffic enforcement and did not require a quantitative analysis that shows "a specific result in grams of alcohol per 210 liters of breath." Wis. Admin. Code § TRANS 311.03(13) (Mar. 2012). In this case, the admission of the PBT result does not fit within any plausible exception to the statutory directive and comes with few of the protocols that assure the integrity and reliability of the tests authorized by Wis. Stat. § 343.305(3).
¶ 111. Wisconsin Stat. § 343.303 creates a regimen that encourages a driver's cooperation with law enforcement inasmuch as the test result is inadmissible, except as provided by statute, and a refusal to take the PBT strengthens the probable cause for an arrest. Permitting the results of PBTs taken in hospital settings to be used later against hospital patients in court will engender distrust between doctors and patients and create disincentives for patients to comply with the requests of their doctors. Once courts open the door to use of PBT results without safeguards and without legislative authorization, evasions of the directive in § 343.303 will become commonplace, and the essential purpose of the statute will be thwarted.
CORRECTNESS OF MODIFIED JURY INSTRUCTION 1185
¶ 112. Rocha-Mayo's second issue is "whether it was error to instruct the jury it could find, based solely on a qualitative test result, that Rocha-Mayo was intoxicated at the time of the accident."
*127 ¶ 113. The majority's response to this question is, "[W]e assume, without deciding, that the circuit court erred under these circumstances in utilizing Wis JI— Criminal 1185 to instruct the jury on its use of the PBT evidence," majority op., ¶ 4, but the error was harmless beyond a reasonable doubt. Id., ¶ 5.
¶ 114. The circuit court gave the following instruction in relation to the third element of the offense charged under Wis. Stat. § 940.09(l)(a), namely, that the defendant was under the influence of an intoxicant at the time the defendant operated a vehicle.
The third element is the defendant was under the influence of an intoxicant at the time the defendant operated a vehicle.
"Under the influence of an intoxicant" means that the defendant's ability to operate a vehicle was materially impaired because of consumption of an alcoholic beverage.
Not every person who has consumed alcoholic beverages is "under the influence" as that term is used here. What must be established is that the person has consumed a sufficient amount of alcohol to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.
It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle be materially impaired.
The law states that the alcohol concentration in a defendant's breath sample taken within three hours of operating a vehicle is evidence of the defendant's alcohol concentration at the time of the operating.
If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of *128 the defendant's breath at the time the test was taken, you may find that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You, the jury, are here to decide this question on the basis of all the evidence in this case, and you should not find the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.
¶ 115. The circuit court omitted four words from the standard instruction when it gave the instruction above: namely, "from that fact alone." Normally, the last paragraph of the instruction reads:
If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of the defendant's breath at the time the test was taken, you may find from that fact alone that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You the jury are here to decide this question on the basis of all the evidence in this case, and you should not find that the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.
Wis JI — Criminal 1185.
¶ 116. The wording of the standard instruction makes clear that it is derived from Wis. Stat. § 885.235(lg)(c) and is intended to be used for a test authorized by Wis. Stat. § 343.305(3), not a PBT authorized under Wis. Stat. § 343.303. Removal of the four words really changes nothing, because the standard instruction never requires the jury to find that the defendant was under the influence of an intoxicant. The instruction as written and the instruction as modified both authorize or permit the jury to find a defen *129 dant guilty if it is satisfied beyond a reasonable doubt that the defendant had .08 grams or more of alcohol in 210 liters of his breath at the time the test was taken. After all, to quote the instruction, "The law states that the alcohol concentration in a defendant's breath sample taken within three hours of operating a vehicle is evidence of the defendant's alcohol concentration at the time of the operating," and the test result was .086.
¶ 117. Immediately following instruction 1185 cited above, the court gave an instruction in relation to the defendant's defense:
Wisconsin law provides that it is a defense to this crime if the death would have occurred even if the defendant had been exercising due care and had not been under the influence of an intoxicant.
The burden is on the defendant to prove by evidence which satisfies you to a reasonable certainty by the greater weight of the credible evidence that this defense is established.
"By the greater weight of the credible evidence" is meant evidence which, when weighed against that opposed to it, has more convincing power. "Credible evidence" is evidence which in the light of reason and common sense is worthy of belief.
Evidence has been received relating to the conduct of Travis Bestwick at the time of the alleged crime. Any failure by Travis Bestwick to exercise due care does not by itself provide a defense to the crime charged against the defendant. Consider evidence of the conduct of Travis Bestwick in deciding whether the defendant has established that the death would have occurred even if the defendant had not been under the influence of an intoxicant and had been exercising due care.
*130 If you are satisfied to a reasonable certainty by the greater weight of the credible evidence that this defense is proved, you must find the defendant not guilty.
If you are not satisfied to a reasonable certainty by the greater weight of the credible evidence that this defense is proved and you are satisfied beyond a reasonable doubt that all elements of this offense have been proved, you should find the defendant guilty.
If you are not satisfied beyond a reasonable doubt that all elements of this offense have been proved, you must find the defendant not guilty.
¶ 118. More than anything else in the court's instructions to the jury, these paragraphs relate to Rocha-Mayo's explanation and defense of his conduct. But the quoted paragraphs immediately followed a potent instruction that should not have been given.
HARMLESS ERROR
¶ 119. The majority assumes, even if it does not concede, two critical errors in Rocha-Mayo's trial. It dismisses these errors as harmless beyond a reasonable doubt by pointing to evidence sufficient to sustain the defendant's conviction.
¶ 120. In State v. Martin, 2012 WI 96, ¶ 45, 343 Wis. 2d 278, 816 N.W.2d 270, this court repeated the classic test for harmless error: whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Id. (quoting State v. Harvey, 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189). But the court added valuable commentary:
Framed a different way, an "error is harmless if the beneficiary of the error proves 'beyond a reasonable *131 doubt that the error complained of did not contribute to the verdict obtained.'" State v. Mayo, 2007 WI 78, ¶ 47, 301 Wis. 2d 642, 734 N.W.2d 115 (quoting State v. Anderson, 2006 WI 77, ¶ 114, 291 Wis. 2d 673, 717 N.W.2d 74). Therefore, this court must be satisfied, beyond a reasonable doubt, not that the jury could have convicted the defendant (i.e., sufficient evidence existed to convict the defendant), State v. Weed, 2003 WI 86, ¶ 28, 263 Wis. 2d 434, 666 N.W.2d 485, but rather that the jury would have arrived at the same verdict had the error not occurred. See Harvey, 254 Wis. 2d 442, ¶ 46 (quoting [Neder v. United States, 527 U.S. 1, 18 (1999)]).
Id. (citation omitted).
¶ 121. The court went on to cite several factors that assist a court's analysis of whether an error is harmless. Id., ¶ 46. These factors include "the importance of the erroneously admitted evidence" and "the nature of the defense." Id.
¶ 122. It would be hard for this writer to contend that the defendant would not have been convicted and should not have been convicted of something for his role in Bestwick's death. The issue, however, is whether the jury would have arrived at the same verdict on all the offenses charged had the errors not occurred.
¶ 123. It must be remembered that the Kenosha County District Attorney did not charge Rocha-Mayo with a violation of Wis. Stat. § 940.09(1)(a) (homicide by intoxicated use of a vehicle) until many months after the accident because he did not have an authorized breath or blood test, and he thought the PBT result was inadmissible. If he had not been encouraged to file this charge with the implication that the PBT result would be admitted, he might never have filed the charge at all.
*132 ¶ 124. If the test result had not been admitted, the jury would not have had any numerical evidence of the amount of alcohol in the defendant's breath. If the test result had not been admitted, the court likely would not have read the disputed portion of Wis JI— Criminal 1185, even if a homicide by intoxicated use of a vehicle charge had been filed.
¶ 125. Erroneously admitting the PBT result as legitimate evidence gave scientific support to Dr. William Falco's opinion testimony that the defendant was intoxicated. This testimony, whether it was correct or incorrect, would have been much less powerful absent the PBT result.
¶ 126. In short, to assert not only that the jury could have convicted the defendant of Wis. Stat. § 940.09(1)(a) but also that the jury would have convicted the defendant of that offense — beyond a reasonable doubt — without the inadmissible PBT result and the mistaken instruction — is not persuasive because it greatly undervalues the effect of having a chemical test of the defendant's breath, blood, or urine as evidence in a criminal prosecution.
¶ 127. But the effect of the two errors may have been even greater.
¶ 128. Rocha-Mayo had a recognized legal defense to the charge of homicide by operation of a motor vehicle while under the influence — a defense alluded to in Judge Warren's jury instructions. He did not have an equivalent legal defense to the charges under Wis. Stat. §§ 940.02 and 941.30. Nonetheless, Rocha-Mayo did have an avenue for attacking the element of "circumstances that show utter disregard for human life" in both offenses. The jury instructions for Wis. Stat. §§ 940.02 and 941.30 both contain the following language:
*133 In determining whether the circumstances of the conduct showed utter disregard for human life, consider these factors: what the defendant was doing; why the defendant was engaged in that conduct; how dangerous the conduct was; how obvious the danger was; whether the conduct showed any regard for life; and, all other facts and circumstances relating to the conduct.
Wis JI — Criminal 1020, 1345 (emphasis added) (footnote omitted).
¶ 129. The comment to Wis JI — Criminal 1020 for first-degree reckless homicide observes, "All the circumstances relating to the defendant's conduct should be considered in determining whether that conduct shows 'utter disregard' for human life. These circumstances would include facts relating to the possible provocation of the defendant." The comment continues: "Evidence of provocation will usually be admissible in prosecutions for crimes requiring criminal recklessness . . . (and, in prosecutions under this section, whether the circumstances show utter disregard for human life)." Comment, Wis JI—Criminal 1020 (quoting Judicial Council Note to § 940.02, 1987 S.B. 191). Similar language is found in the Comment to Wis JI — Criminal 1345 related to first-degree recklessly endangering safety.
¶ 130. Wisconsin Jury Instruction 1185 invited the jury to find the defendant guilty of operating his vehicle under the influence and causing the death of Bestwick because of the .086 PBT result. Any juror who accepted that invitation was likely to disregard Rocha-Mayo's legal defense and likely to dismiss the effect of provocation in evaluating an attack on the element of "utter disregard for human life."
¶ 131. The admission of inadmissible evidence and the faulty instruction that was given because of the *134 admission of that inadmissible evidence were critically tied to all three felony convictions.
¶ 132. The jury deliberated in Rocha-Mayo's case for about 20 hours, over four days, before rendering its verdict. It twice advised the court that the jurors were deadlocked. When the verdicts finally came, many of the jurors cried as the verdicts were read.
¶ 133. When an admired circuit court judge instructed the jury "upon the principles of law which you are to follow in considering the evidence," he made this statement: "It is your duty to follow all of these instructions. Regardless of any opinion you may have about what the law is or ought to be, you must base your verdict on the law I give you in these instructions."
¶ 134. The jury struggled to discharge its duty. It agonized over its decision. For the court now to say that two critical errors at trial were harmless in their effect on the jury is to deny reality and forget our purpose as a reviewing court.
¶ 135. Because I believe the defendant must be given a new trial, I respectfully dissent.
¶ 136. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

 Rocha-Mayo was in custody, on $100,000 bond, from the time of his arrest until the time of trial, and he received 865 days of credit on the ten years of confinement in his bifurcated sentence.

 Motorcycles have been a rich and important part of Wisconsin history. Nothing in this dissent is intended to imply any criticism whatsoever of the overwhelming number of responsible motorcycle owners and operators in this state.

 Wisconsin Stat. § 885.235(1g) reads in part:
In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant. . . evidence of the amount of alcohol in the person's breath, is admissible on the issue of whether he . . . was under the influence of an intoxicant or had a prohibited alcohol concentration or a specified alcohol concentration if the sample was taken within 3 hours after *124 the event to be proved. The chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect:
(c) The fact that the analysis shows that the person had an alcohol concentration of 0.08 or more is prima facie evidence that he .. . was under the influence of an intoxicant and is prima facie evidence that he . . . had an alcohol concentration of 0.08 or more.