REBECCA GRASSL BRADLEY, J. (dissenting).
¶ 68 In this court, everyone agrees the circuit court erred in excluding the GPS data, which revealed the excessive speeds R.C.'s car traveled both on the way to the party and on the way from the party to the stop in Shullsburg. The only question is whether this erroneous exclusion of evidence was harmless. It was not. If the jury had heard that R.C.'s car grossly exceeded the speed limit both on the way to the party and while traveling from the party to Shullsburg-when independent witnesses testified that R.C. drove away from the party-the State could not have made the same closing argument and Monahan would have had evidence to support his defense. The excluded evidence plus the State's argument-unrefuted at trial as a result of the erroneous evidentiary ruling-that R.C. never would have driven that fast on unfamiliar roads, create reasonable doubt as to whether a rational jury would have found Monahan guilty absent the error. Accordingly, I conclude the error was not harmless and respectfully dissent.
I
¶ 69 There were no eyewitnesses to this single car accident. Only two people actually *908 knew what happened. One of them did not survive the accident; the other, Monahan, testified he does not remember anything between the time he and R.C. left the party and the time he woke up in the hospital. The car's GPS unit does give some information about the car's speed and location on the day of the accident. The GPS data allowed Monahan's accident reconstruction expert to calculate how fast the car was driven both on the way to the party and on the way from the party to Shullsburg. The GPS data also showed a two-minute stop in Shullsburg. Finally, the data allowed both Monahan's and the State's accident reconstructionists to calculate the speed the car was traveling after the two-minute stop until the crash. The speed calculations estimated the car's speed on the way to the party at 79-93 miles per hour. The car's estimated speed during the segment from the party to the Shullsburg stop was 82-105 miles per hour. After the brief stop in Shullsburg, the car's speed reached 97-120 miles per hour during the trip from Shullsburg until the crash.[1] The GPS unit listed the "max speed" the car had traveled as 123 miles per hour. The only estimated speed evidence the jury heard was that at the time of the crash, the car's speed was 87-98 miles per hour. We also know that both occupants were ejected from the car during the crash and neither Monahan nor R.C. were wearing seatbelts. The sunroof and the front passenger side window were open. Finally, it is undisputed that both Monahan and R.C. had been drinking. Both had blood alcohol content above the legal limit.
¶ 70 The State's entire case depended on proving that Monahan was in fact driving at the time R.C.'s car crashed. There were no eyewitnesses to the crash itself and no eyewitness put Monahan behind the wheel. To prove its case, the State presented testimony from State Trooper Thomas Parrott who prepared a reconstruction of the accident. Parrott testified he believed Monahan was driving based on where Monahan's and R.C.'s bodies landed after ejection. Parrott believed R.C. was ejected through the open passenger window before the airbags deployed. The State also introduced evidence showing that the driver's seat was positioned four inches farther back than the passenger's seat. Using this information, together with the fact that Monahan was taller than R.C., the State argued Monahan was the driver at the time of the crash. Additionally, the State relied on evidence showing the driver's side airbag had a major and a minor contributor of DNA and that the major contributor was Monahan. The State also introduced Monahan's numerous statements. In some of these statements, Monahan said he was the driver. The only GPS evidence the circuit court admitted showed that the car stopped for just over two-minutes in Shullsburg, and Parrott testified that he estimated the car's speed at the time of the crash to be between 87-98 miles per hour based upon the GPS data. The prosecutor seized upon this speed evidence to argue during closing:
[Monahan] testified he knew the hills, knew the curves, knew the terrain of that road. Why would a young woman from Maine who's living in Chicago, who doesn't know the roads, who by all accounts hadn't been on that road and if-had been maybe once or twice, why would she be driving? She didn't know the area.
*909 The prosecutor further emphasized this point by arguing:
[R.C.] didn't know her way around. So using your common sense, you need to ask yourself, does it make sense that a young girl who doesn't know the area, is driving on some rural road and driving, no less, after she'd been drinking and at speeds of 40 to 50 miles per hour over the speed limit? That doesn't make sense.... Using your common sense, that tells you it's the defendant behind the wheel.
And, later, the State emphasized again:
If it's [R.C.] who was driving that night, again we'd have to believe she's driving on that rural country road in a place she's not familiar with on a road she's not familiar with. Despite the fact that she's not familiar with that road, we have to believe that she's traveling-after having some drinks, traveling 40 to 50 miles per hour over the speed limit on a road she has no experience or familiarity with.
¶ 71 Without the pre-Shullsburg stop GPS speed calculations in evidence, Monahan could not refute the State's "common sense" and persuasive argument. Now, on appeal, the State concedes that excluding the pre-Shullsburg stop GPS-calculated speeds was in fact error, but it asserts the exclusion was harmless error. The majority agrees with the State that this error was harmless-that it had no impact on the verdict and even if the jury heard the complete GPS evidence, the jury still would have convicted Monahan. In reaching its harmless error conclusion, the majority improperly applied the harmless error standard. Applying the harmless error standard correctly, I conclude the exclusion of the GPS evidence was not harmless and I would reverse the decision of the court of appeals and remand for a new trial.
II
¶ 72 Before Congress adopted the harmless error rule in 1919, criminal cases were retried with some regularity when an error occurred during the trial, regardless of whether the error was minimal or material. See, e.g., Kotteakos v. United States, 328 U.S. 750, 759, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ("[Appellate courts] tower above the trials of criminal cases as impregnable citadels of technicality" (quoting Marcus A. Kavanagh, Improvement of Administration of Criminal Justice by Exercise of Judicial Power 11 A.B.A.J. 217, 222) (1925)). The federal harmless error rule was codified "to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." Bruno v. U.S., 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 257 (1939). The rule, versions of which have been enacted in Wisconsin and other states, "block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The error in Monahan's trial cannot be fairly characterized as "mere etiquette" nor minutiae of procedure. The error precluded him from presenting his defense with respect to the main issue at trial: who was driving the car.
¶ 73 Whether an error is harmless beyond a reasonable doubt is a question of law. See State v. Nelson, 2014 WI 70, ¶ 18, 355 Wis. 2d 722, 849 N.W.2d 317. The harmless error test is easily defined but difficult to apply. The test requires the State to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" by showing "that a rational jury would have found the defendant guilty absent the error."
*910 State v. Hunt, 2014 WI 102, ¶ 26, 360 Wis. 2d 576, 851 N.W.2d 434. The reviewing court looks at the effect the error had on the verdict. Id. In applying the harmless error test, we consider several factors. As relevant here, the court examines: (1) the importance of the erroneously excluded evidence; (2) whether there is evidence corroborating or contradicting the erroneously excluded evidence; (3) "the nature of the defense"; (4) "the nature of the State's case"; and (5) "the overall strength of the State's case." Id., ¶ 27.[2]
¶ 74 Factor (1), the importance of the excluded evidence, cannot be disputed, particularly given the State's exploitation of it during closing argument. Monahan's only defense was that he was not driving at the time of this accident. The excluded evidence would have supported that defense. If all the GPS evidence had been admitted, the jury would have learned R.C. drove her car excessively fast. It would have shown that despite her unfamiliarity with the area, she drove far above the posted 55 miles per hour speed limit. Applying factor (1) demonstrates the harmfulness of excluding the GPS data.
¶ 75 As to factor (2), Monahan would have used the GPS evidence to show R.C. drove at high rates of speed. There was no evidence in the record to that effect. The State did not and could not present any direct evidence or eyewitness testimony to disprove Monahan's defense that R.C. was driving her car and refused to let anyone else drive it. The main evidence contradicting this defense was Parrott's supposition, bolstered by the State's closing argument that R.C. never would have driven so fast on unfamiliar roads. Admitting all the GPS evidence would have supported Monahan's defense and poked holes in the State's argument. Applying factor (2) illustrates how excluding this evidence was harmful.
¶ 76 Factor (3) looks to the nature of the defense. Monahan presented contrary expert witness testimony from his engineering expert, Paul Erdtmann, who reconstructed the accident. Erdtmann opined that it is impossible, based on the physical evidence, to discern who was driving at the time of the crash. Erdtmann refuted each of the factors underlying Parrott's opinion that Monahan was driving. Erdtmann presented a photo showing a woman of R.C.'s height could comfortably reach the controls to operate the same type of car with the driver's seat in the same position. Another photo showed that a man of Monahan's height would fit comfortably in the passenger side of the same type of car with the seat in the same position as the subject car's passenger seat. Erdtmann offered an explanation for the major and minor DNA located on the driver's airbag-the bodies were moving around during the rollover and both could leave DNA on the airbag regardless of which seat each occupied. Moreover, State-witness, Dr. Robert Corliss, a forensic pathologist who performed R.C.'s autopsy, testified on cross-examination that, in a rollover accident during which the car's occupants were not wearing seatbelts and were ejected *911 from the car, it is not possible to discern whether R.C. was in the driver's or passenger's seat.
¶ 77 Monahan also testified in his own defense. He explained he had no memory of the accident. He remembered leaving the party with R.C., who was driving him in her car. She had driven him to the party and she drove him after the party. He told the jury that he never drove R.C.'s car because she never let anyone else drive it.
¶ 78 One eyewitness testified R.C. was driving when the two arrived at the party. No witness contradicted that testimony. Two other independent eyewitnesses who were at the party testified they recalled R.C. driving when she and Monahan left the party. One remembered Monahan flashing a big smile at her from the passenger seat as the car drove away. The other testified that Monahan and R.C. walked by him on the way to her car and the witness saw R.C. get in the driver side and saw Monahan in the passenger seat. No witness contradicted that testimony. A third independent witness testified that R.C. never let anyone drive her car. No witness contradicted that testimony.
¶ 79 The defense case was not weak, and admission of the excluded GPS evidence certainly would have strengthened it, lending credibility to Monahan's testimony and raising reasonable doubt. Applying factor (3) necessitates the conclusion that the erroneous exclusion was harmful.
¶ 80 Factors (4) and (5) each address the State's case and will be considered together. The State's case was likewise not weak. Its accident reconstructionist put Monahan in the driver's seat at the time of the crash. The State presented Monahan's multiple statements to the effect that he was driving through live testimony of the eyewitnesses who heard the statements. These statements consisted of (1) statements at the scene, (2) statements in the helicopter transporting him to the hospital, (3) statements at the hospital, and (4) statements after recovery. First, at the scene:
• When emergency personnel found Monahan in a cornfield, he was unconscious and unrecognizable. When Monahan regained consciousness, he repeatedly asked "what happened"; he did not know who he was or how many people were in the car or where he had been. EMTs repeatedly asked him who was driving, but received no answer. Monahan eventually responded, "I was driving, I guess."
• The Chief of Police, Richard Moyer, asked Monahan if there was anyone else in the car and Monahan said he did not know; when Moyer asked who was driving, Monahan responded that he did not know.
• Sergeant Darrell Morrissey testified that when he asked Monahan who was driving, Monahan said he did not remember or did not know. When Morrissey asked Monahan if there was anyone else in the car besides R.C., Monahan answered he was not sure.
• Deputy Sheriff Paul Klang testified he asked Monahan if he was the driver and Monahan replied that he did not remember. When Klang told Monahan there was a female in the car, Monahan said, "I probably was driving, then." Monahan told Klang he did not remember where he was coming from. Klang also told the jury that he overheard Monahan say to an EMT or firefighter, "that is the last time I will drink and drive."
• An EMT, who was also a religious minister, testified he heard Monahan say "I fell asleep" and "I'll never drink again."
*912 • Sheriff Deputy Michael Gorham testified he spoke with Monahan at the scene while Monahan was lying on a backboard and being tended to by emergency personnel. Gorham asked how many people were in the car. Monahan answered: "It depends who's asking" and subsequently said that he and "his girlfriend" were in the car. When Gorham asked who was the driver, Monahan said "I might have been, I guess."
• Gorham again approached Monahan, this time with a digital tape recorder to get a more definitive statement. When Gorham asked, "Were you the driver?", Monahan answered, "Yeah, I guess." Gorham told Monahan a fireman said he saw Monahan driving the car out of Shullsburg and asked "so you were the driver?" Monahan replied, "Yeah, I guess." When Gorham asked, "You're not BSing or anything right?", Monahan answered, "I don't think so." The audio-recording was played for the jury and Monahan can be heard groaning in pain. Medical personnel interrupted Gorham's questioning to insert an IV. Monahan expressed he was in pain. Gorham resumed the questioning, asking if Monahan could "explain what happened," and Monahan replied, "No." Gorham pressed, "You don't remember how the crash occurred?" to which Monahan replied, "My tires went off the side of the road and I believe it was I lost control." [sic] When Gorham followed up by asking about the tires, Monahan asked, "Can we talk tomorrow?"[3]
¶ 81 During the flight to the hospital, Monahan told the flight nurse and medic he remembered what happened-he was driving and he was wearing his seatbelt. Prior to the flight, Monahan had been given Fentanyl, a pain medication.
¶ 82 At the hospital, Monahan signaled to his nurse that he wanted paper and pencil. He could not speak because he was intubated. Monahan wrote he remembered the accident-he was going too fast over a hill and lost control.
¶ 83 During an interview with a state trooper ten days after the crash and after Monahan had been released from the hospital, Monahan said he had "no idea" who was driving at the time of the crash and he "did not have memory of the crash at all." Monahan also told the trooper that the car belonged to R.C. and he had never driven her car. Five months after the crash, the state trooper interviewed Monahan again. Monahan told the trooper he still had no recollection of the crash. Monahan said R.C. was an aggressive, "kind of nuts" driver. The trooper asked Monahan to give a DNA sample so it could be compared to physical evidence collected from the car. Monahan agreed, saying, "It doesn't matter, you know, I wasn't driving." At the time of this statement, Monahan was still seeing a neurologist. He was not cleared to return to work until nine months after the accident.
¶ 84 The State's case relied on Monahan's statements, Parrott's reconstruction opinion, and the DNA airbag evidence. In addition, R.C.'s mother testified during the State's rebuttal case that R.C. drove as close to the steering wheel as possible.[4]
*913 Although this evidence is certainly sufficient to convict Monahan, it is by no means overwhelming. First, Monahan's statements are far from conclusive. Most could be accurately described as equivocal. Many of his statements were given within minutes of a high-speed car crash, which caused serious injury, including immediate unconsciousness and a later-diagnosed head injury.[5] One of Monahan's statements was given only after being told he was the driver. Many of these statements were given while Monahan was in severe pain. His statement in the helicopter admitting that he was driving was given at the same time he either lied or mistakenly stated he was wearing his seatbelt. It could easily be discounted.
¶ 85 Second, Parrott was not the only reconstructionist to testify at trial. Monahan's expert refuted Parrott's testimony in every regard. And, the jury heard that Parrott's report included false information. Namely, his report said he excluded R.C. as the driver because lab results analyzing the car's window fragments did not contain R.C.'s DNA. At trial, Parrott admitted that this was an error-no glass fragments were ever tested in this case. Parrott explained this mistake appeared in his report because he "cut and pasted" it from another report for a different "who was the driver" reconstruction case; he inserted R.C.'s name in place of the person from his other case. Moreover, Parrott's opinion that Monahan was driving was based on his comparison of Monahan's and R.C.'s shoes to what he claimed were "little flecks" on the gas and brake pedal. But, he admitted he was not a footprint expert. He conceded that Karley Hujet of the Wisconsin State Crime Lab, who performed the official analysis of the pedals and the shoes, was the footprint expert. Hujet testified that she could not conclusively say there was a footwear impression and in comparing the pedals to the shoes, she could not say who was driving. Parrott told the jury the reason he could opine that Monahan's shoes were on the pedals when Hujet could not was because Hujet was bound by industry standards, which did not apply to him.
¶ 86 Third, Monahan's expert gave an explanation regarding the DNA on the airbag, which refuted Parrott's opinion on seat position and dirt evidence. Parrott's reconstruction theory had R.C. ejecting from the car before the airbags deployed, leaving unanswered the question of why the driver's airbag had a second person's DNA on it.
¶ 87 Finally, R.C.'s mother's testimony that her daughter would drive with her seat as close to the steering wheel as possible cannot prove that R.C. did so while driving her car on the day of the crash nor can it establish that Monahan was driving. We simply do not know, and the mother's testimony alone cannot make the erroneous exclusion of the complete GPS evidence harmless.
¶ 88 There certainly are cases in which the State's evidence is so overwhelming and uncontested that a reviewing court can say, as a matter of law, the evidentiary error had no impact. But this is not one of those cases. Factors (4) and (5) do not demonstrate beyond a reasonable doubt that excluding the GPS evidence had no impact on the verdict or that the jury *914 would have convicted Monahan absent the error.
¶ 89 Application of the Hunt factors shows that the erroneous exclusion of evidence in this case was not harmless. This was a close case. Excluding the complete GPS data prevented Monahan from introducing evidence to corroborate his expert's opinion and his defense. At the same time, its exclusion allowed the State to persuasively argue in favor of its expert's theory. We do not know which theory a jury presented with all the GPS evidence would believe. But, its exclusion, exploited by the State in its closing, creates reasonable doubt as to whether a rational jury would have found Monahan guilty absent the error; the State has failed to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Therefore, the error was not harmless and Monahan should get a new trial during which he can present the GPS evidence to support his defense.
III
¶ 90 The trial court's erroneous exclusion of evidence prevented Monahan from fully presenting his defense, which is a constitutional error. A criminal defendant has a Sixth Amendment right to present his defense. Washington v. Texas, 388 U.S. 14, 18-19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (discussing criminal defendant's "right to present a defense, the right to present the defendant's version of the facts" so the jury can compare to the State's version to "decide where the truth lies."). "The evidence the defendant seeks to introduce, however, must be 'both material and favorable to his defense.' " State v. Ward, 2011 WI App 151, ¶ 16, 337 Wis. 2d 655, 807 N.W.2d 23 (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) ). The evidence excluded in this case is material and favorable to Monahan's defense, satisfying both criteria. By excluding this evidence, the circuit court violated Monahan's right to present a defense. A new trial would give him a fair opportunity to defend against the State's accusations. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").
¶ 91 The trial court committed a constitutional error in depriving the jury of evidence material to Monahan's defense and the majority errs in denying Monahan a new trial in which he could present it. Because it is far from clear beyond a reasonable doubt that a rational jury would have found Monahan guilty if it had heard the excluded evidence, I respectfully dissent.
¶ 92 I am authorized to state that Justices SHIRLEY S. ABRAHAMSON and ANN WALSH BRADLEY join this dissent.

These numbers come from Monahan's expert engineer's report. The State's expert calculated only the speed at the time of the crash, and told the jury the car was traveling at 87-98 miles per hour.

The majority considers two additional factors-frequency of the error and whether the excluded evidence would have been duplicative. These extra factors are referenced in a 2012 case, State v. Martin, 2012 WI 96, ¶ 46, 343 Wis. 2d 278, 816 N.W.2d 270, cited by the majority. Majority op., ¶ 35. The list of factors considered under the harmless error test are non-exhaustive. See State v. Hunt, 2014 WI 102, ¶ 27, 360 Wis. 2d 576, 851 N.W.2d 434. In any event, the frequency-of-an-error factor is of limited value when the error was exclusion of evidence and thus I do not address it. As for the duplicative factor, the majority concedes that this favors Monahan as it is undisputed that exclusion of the complete GPS speed evidence was not duplicative of other admitted evidence. Majority op., ¶ 48.

No firefighter testified to making the statement to Gorham and Gorham told the jury he was not able to locate the firefighter.

The actual testimony was: "She would always have her seat as close up to the steering wheel as she possibly could." And when shown Erdtmann's photo she said: "The model is much farther back than [R.C.] would have been."

Monahan's medical records show he had surgery on his spleen, was hospitalized for six days, and his injuries included traumatic shock, lung contusion, fractures to the cervical, lumbar, and thoracic vertebrae, rib fracture, and a concussion with loss of consciousness.