COURT OF APPEALS
DECISION
DATED AND FILED

October 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1565-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF255

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

RYAN HUGH MULHERN,

DEFENDANT-APPELLANT.

APPEAL from judgments of the circuit court for Pierce County: JOSEPH D. BOLES, Judge. *Reversed and cause remanded for further proceedings.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Ryan Mulhern appeals judgments, entered pursuant to a jury's verdict, convicting him of second-degree sexual assault by use of force and misdemeanor bail jumping.[1] The issue before us is whether the circuit court's decision to allow the victim, Alyssa,[2] to testify that she did not have sexual intercourse with anyone other than Mulhern in the week before the alleged assault was harmless error.[3] For reasons explained below, we conclude the court's error was not harmless, and we therefore reverse the judgment convicting Mulhern of second-degree sexual assault. Because Mulhern's bail jumping conviction was premised solely on the sexual assault conviction, we must also reverse the bail jumping conviction. *See* **State v. Hansford**, 219 Wis. 2d 226, 230, 244-45, 580 N.W.2d 171 (1998); *see also* **State v. Turnpaugh**, 2007 WI App 222, ¶8, 305 Wis. 2d 722, 741 N.W.2d 488. We therefore reverse the judgments of conviction and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶2 A criminal complaint charged Mulhern with one count each of second-degree sexual assault by use of force, strangulation and suffocation, and misdemeanor bail jumping. The charges stemmed from an allegation that Mulhern

---

[1] We note that the circuit court entered separate judgments for the second-degree sexual assault count, which was entered upon a jury's verdict, and the misdemeanor bail jumping count, which was entered based on Mulhern's stipulation that a guilty verdict on the sexual assault count supported a conviction on the bail jumping count. In Mulhern's notice of appeal, he states he is appealing from "the entire final judgment." We construe the notice of appeal as encompassing both judgments.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2017-18), we refer to the victim using a pseudonym. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[3] The State concedes that this testimony violated Wisconsin's rape shield statute, WIS. STAT. § 972.11.

sexually assaulted Alyssa in her home during the early morning hours of November 22, 2016.

¶3 Mulhern waived his right to a jury trial on the misdemeanor bail jumping charge, and he stipulated that the circuit court would find him guilty of that charge if the jury returned a guilty verdict on either of the other two counts. The matter then proceeded to a jury trial on the second-degree sexual assault and strangulation and suffocation counts.

¶4 Alyssa testified that on the evening of November 21, 2016, Mulhern called her, "begging to come over to be consoled … as a friend." She explained that Mulhern sounded "upset" and "almost frantic" over some personal issues. Alyssa agreed to let Mulhern come over, but she informed him that he "would stay on the futon; I would be there for him as a friend, and that would be all it was."

¶5 Alyssa stated that after Mulhern arrived, they talked for a while and then she told him she was going to bed because she had an exam the next morning. She told Mulhern he also needed to go to sleep and she "directed him to the futon." Rather than go to the futon, however, Mulhern followed Alyssa to her bed and lay down next to her.

¶6 Alyssa testified that Mulhern initially "just tr[ied] to cuddle" with her, and that she did not object to that contact. However, Mulhern then tried to kiss her, at which point Alyssa "kind of shove[d] him off" of her. When he persisted, Alyssa "kept telling him" to "stop." Instead of stopping, Mulhern began to use his hands on Alyssa's "face and shoulders" to keep her from moving and to "direct [her] face to his."

¶7 Alyssa explained that Mulhern eventually escalated from attempting to kiss her to removing his clothes and pressing his erect penis against her. She stated that he then tried to remove her clothes, and that her attempts to fend him off caused him to become "more angry and more forceful." As the assault progressed and Alyssa tried to escape, Mulhern put his "arm around [her] neck" and pulled her back into the bed. Mulhern then penetrated her vagina with his penis. When Alyssa tried to scream, Mulhern covered her nose and face with his hand.

¶8 Alyssa stated that the next thing she remembered was being curled up in a ball against her bedroom wall with Mulhern standing near her bed, asking what was wrong. Alyssa told him to leave, which he did not do until she threatened to call the police. Once Mulhern left, Alyssa called one of her roommates (who was not at home at the time), told the roommate what happened, and asked for her to return home. While waiting for the roommate to return, Alyssa took a shower because she felt "disgusting [and] dirty." Alyssa stated she did not use any soap during this shower.

¶9 At approximately 11:30 a.m. on the morning of the assault, Alyssa contacted a local sexual assault resource team (SART). The SART nurse who examined Alyssa testified that Alyssa had the following injuries: tenderness and tightness on her neck; a sore throat; a "semi-circular wound" on her shoulder; tenderness on her right chest, inner thighs and inner calves; tenderness on her inner and outer labia; a linear tear on her left inner labia; an abrasion on her right vaginal wall; and redness on her left vaginal wall. The nurse stated that these injuries were consistent with Alyssa's "stated history" of sexual assault.

¶10    State Crime Lab Analyst Vincent Purpero testified regarding DNA tests he performed on evidence collected as part of Alyssa's sexual assault examination kit.    Specifically, Purpero determined that a swab taken from Alyssa's neck revealed the presence of both Alyssa's and Mulhern's DNA. Purpero also detected, in the neck swab, the presence of amylase, which he explained is a protein found in high concentrations in saliva.

¶11    Purpero stated that testing on the remaining evidence—which included vaginal, cervical, anal, external genital, and mons pubis area swabs, as well as left and right fingernail samples—revealed "either a limited amount or a lack of male DNA."   Regarding the test results for the vaginal swab in particular, Purpero explained that foreign male DNA was present, but that the amount of DNA was insufficient to allow him to identify the contributor of that DNA.

¶12    Purpero also testified that when foreign DNA is deposited on a person's body, that person's body will eventually "slough cells or cleanse itself" of the foreign DNA.  He also acknowledged that showering can remove foreign DNA from a person's body.

¶13    Before resting its case, the State sought to recall Alyssa.  The State informed the circuit court that it wished to recall Alyssa to ask her, as relevant to this appeal, whether she had had sexual intercourse or sexual contact with anyone during the week leading up to the reported assault.

¶14    Mulhern's counsel objected to the State's proposed question on the ground that it violated Wisconsin's rape shield statute.  The circuit court overruled this objection, reasoning that the rape shield statute prohibited testimony concerning sexual conduct, and the testimony the State sought to elicit concerned only "lack of conduct."  Accordingly, the State recalled Alyssa, and she testified

5

that she did not have sexual intercourse or sexual contact with anyone during the week leading up to the reported assault.

¶15    The State then recalled Purpero and asked him how long "foreign DNA deposited in the vagina remain[s] there?" Purpero responded, "five days after an assault, we generally would not see any evidence of foreign DNA remaining or persisting in—in the vagina."

¶16    Mulhern testified in his own defense. He acknowledged that he went to Alyssa's house shortly after midnight on November 22, 2016. He stated that once he arrived, he and Alyssa went into her bedroom and talked for approximately one-half hour.

¶17    According to Mulhern, he and Alyssa then began kissing on her bed. He said that he continued to kiss her on the mouth, neck, collarbone, and shoulder for approximately seven to ten minutes, and that Alyssa gave no indication that she did not want to kiss him during that time period. Mulhern explained that the two proceeded to undress, and that "[n]othing really seemed wrong to me, and then we were nearly about to start having sex and she yells, what—what the 'F,' [and] that's when I stood up from the bed."

¶18    Mulhern stated that after Alyssa began yelling, he put his clothes back on. He testified that Alyssa then told him to get out of her house, and he complied with her request. He denied engaging in oral, vaginal, anal or "any other kind of sexual contact with [Alyssa], other than above her waist."

¶19    In its closing argument, the State focused on Alyssa's testimony that she did not have sexual intercourse or sexual contact with anyone during the week leading up to the reported assault. Specifically, the State argued:

> So [Purpero] stated that DNA clears the vagina in five days. So [Alyssa] had stated, in the week prior to the sex assault, she had no sex. So the sex assault was November 22nd, it's the same date as the evidence collection, and there was male DNA found in the vagina. Given this information, I submit to you one reasonable hypothesis, given this information, this timeline, is that the male DNA is the Defendant.

The State again emphasized this testimony in its closing rebuttal argument, stating:

> So again, I don't want to underestimate how important this timeline really is. This is really important and I want to make it understandable and perfectly clear. DNA clears the vagina in five days. [Alyssa] did not have sex with anyone seven days up to the sex assault. Seven days. So the only DNA in [Alyssa's] vagina is her own DNA, okay?
>
> Then November 22nd, that's the date of the sex assault. That's the date she's saying Mr. Mulhern sexually assaulted her. The evidence, the swabs of her vagina, was taken that same day. There's male DNA found in her vagina, it's collected. I submit to you one reasonable hypothesis is that this male DNA is the Defendant's. This is important evidence that I want you to consider. I hope I'm clear on this point.

¶20 The jury found Mulhern guilty of the second-degree sexual assault count and not guilty of the strangulation and suffocation count. Pursuant to Mulhern's stipulation, the circuit court then found him guilty of misdemeanor bail jumping "based on the verdict of the jury." The court imposed concurrent sentences totaling nine years of initial confinement and seven years of extended supervision. Mulhern now appeals.

## DISCUSSION

¶21 Mulhern first argues that the circuit court erroneously exercised its discretion by allowing the State to elicit testimony from Alyssa that she did not have sexual intercourse or sexual contact with anyone during the week leading up

7

to the reported assault. A circuit court erroneously exercises its discretion to admit evidence if the court applies an improper legal standard or makes a decision not reasonably supported by the facts of record. *State v. Jackson*, 2014 WI 4, ¶43, 352 Wis. 2d 249, 841 N.W.2d 791.

¶22 Mulhern contends the circuit court applied an improper legal standard when it concluded that testimony regarding a "lack of [sexual] contact" did not fall within the purview of the rape shield statute. In support, he notes that our supreme court recently rejected this very notion, holding: "Prior sexual conduct includes a lack of sexual conduct, meaning that evidence that a complainant had never had sexual intercourse is inadmissible." *State v. Bell*, 2018 WI 28, ¶63, 380 Wis. 2d 616, 909 N.W.2d 750.

¶23 In response, the State notes that the *Bell* court referenced testimony concerning a witness's complete lack of sexual conduct (i.e., virginity), as opposed to—as occurred in this case—a witness's testimony regarding a lack of sexual conduct over a discrete period of time. Nonetheless, the State acknowledges that "there does not appear to be a basis to believe that [Wisconsin] courts would … distinguish" the former scenario from the latter. Consequently, the State concedes that "the court erroneously exercised its discretion in admitting this part of [Alyssa's] testimony."

¶24 Although the parties agree that the circuit court erroneously exercised its discretion by admitting the challenged portion of Alyssa's testimony, they dispute whether the error warrants a new trial. The admission of evidence that violates the rape shield statute is subject to a harmless error analysis. *State v. Mitchell*, 144 Wis. 2d 596, 619-20, 424 N.W.2d 698 (1988). Under the harmless-error analysis, the party benefiting from the court's error (here, the State)

8

"must show that 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" ***State v. Martin***, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (citation omitted).

¶25 The ***Martin*** court provided the following non-exhaustive list of factors for courts to consider when conducting a harmless error analysis: (1) the frequency of the error; (2) the importance of the erroneously admitted evidence; (3) the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; (4) whether the erroneously admitted evidence duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. ***Id.***, ¶46. The harmless error inquiry is a question of law that we review de novo. ***State v. Magett***, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42.

¶26 Mulhern contends the circuit court's error was not harmless because the State would not have been able to argue to the jury that Mulhern was the only possible contributor of the unidentifiable male DNA found in the vaginal swab, absent the improperly introduced evidence. Stated differently, without the improper evidence and the State's derivative argument, Mulhern contends "there is a reasonable probability that the outcome of the trial would have been different." For its part, the State argues that because the evidence concerning Alyssa's lack of prior sexual conduct was only presented once and the State had a "solid case," the court's error was harmless "under the circumstances."

¶27 We conclude that the State has not met its burden to show that it is clear beyond a reasonable doubt that a rational jury would have convicted Mulhern absent the circuit court's error. In reaching this conclusion, we find the second, third, fourth, fifth, sixth, and seventh ***Martin*** factors to be particularly instructive.

9

¶28 We begin by discussing the fifth and sixth *Martin* factors. Mulhern and the State agree that this was essentially a he said/she said case. In other words, as the State aptly explains, "there was no version of events presented to the jury that [Alyssa] and Mulhern had consensual intercourse. And to that end, the jury was required either to believe [Alyssa's] account and convict Mulhern, or to believe Mulhern's account and acquit him."

¶29 Given this reality, the importance of the erroneously admitted evidence (the second *Martin* factor) was paramount because the evidence corroborated Alyssa's version of events. To explain, the State established through Purpero's testimony that: (1) an unidentified foreign male's DNA was present on the vaginal swab; and (2) foreign DNA does not persist in a vagina for more than five days. Absent the erroneously admitted testimony, the jury would have reason to question whether the unidentified DNA belonged to Mulhern or to a third-party. With the testimony, however, the jury was provided with only one logical explanation—that, contrary to his version of events, Mulhern did have sexual intercourse with Alyssa.

¶30 Lest there be any doubt about the importance of Alyssa's testimony, we need only look to the State's own reliance on, and characterization of that testimony in its closing rebuttal argument. As set forth above, the State called the timeline it constructed, based solely on the erroneously admitted testimony,[4] as

---

[4] To explain, because the State introduced no evidence to corroborate Alyssa's testimony, it had no other basis to construct this timeline. Relatedly, the fact that the challenged testimony was not duplicated by other untainted evidence weighs in favor of finding that the error was prejudicial. Therefore, the third and fourth *Martin* factors support a conclusion that the error was not harmless. *See State v. Martin*, 2012 WI 96, ¶¶53-57, 343 Wis. 2d 278, 816 N.W.2d 270.

10

"really important" and stated it did not "want to underestimate how important" that timeline was to its case.

¶31 As to the seventh *Martin* factor, the State argues it had a "strong case" based on Alyssa's "compelling testimony." The jury's decision to acquit Mulhern on the strangulation and suffocation count, however, suggests that the jury had a reasonable doubt as to whether Alyssa's testimony fully and accurately described Mulhern's actions.

¶32 Indeed, the State, in its closing argument, "submit[ted]" to the jury that Mulhern was guilty on that count based on Alyssa's testimony. In light of the fact that the jury did not return a guilty verdict on that count, we cannot conclude that Alyssa's testimony regarding the described assault was so compelling that a rational jury would have no choice but to accept it.

¶33 The State also argues that because the frequency of the error was low, the first *Martin* factor weighs in favor of a finding of harmless error. We disagree. Even though the testimony was only admitted once, it was introduced at the close of the State's case and then—as we have explained—relied upon and specifically highlighted by the State in its closing argument.

¶34 For these reasons, we conclude the State has not met its burden to show it is clear beyond a reasonable doubt that a rational jury would have found Mulhern guilty absent the erroneous admission of the challenged testimony. *See Martin*, 343 Wis. 2d 278, ¶45. As a result, the error was not harmless. We therefore reverse Mulhern's second-degree sexual assault conviction. Because Mulhern's bail jumping conviction was premised solely on the sexual assault conviction, we must also reverse the bail jumping conviction. *See Hansford*, 219

Wis. 2d at 230, 244-45; *see also* **Turnpaugh**, 305 Wis. 2d 722, ¶8. We remand for further proceedings consistent with this opinion.

*By the Court.*—Judgments reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.